565 A.2d 354

Elizabeth TATUM, et al.

v.

Gregory GIGLIOTTI, et al.

No. 200, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Nov. 3, 1989.

**560**

David J. Perrone (Thomas Fortune Fay and Clower and Fay, P.C., on the brief), Washington, D.C., for appellants.

Sean D. Wallace, Associate Co. Atty. (Michael P. Whalen, Co. Atty., Michael O. Connaughton, Deputy Co. Atty. and J. Michael Dougherty, Jr., Associate Co. Atty., on the brief), Upper Marlboro, for appellees.

Argued before GILBERT, C.J., and MOYLAN and ALPERT, JJ.

ALPERT, Judge.

The dominant issue in this appeal, and one of first impression in Maryland, is whether the immunity provided by Maryland's Good Samaritan Statute (now Md.Cts. & Jud. Proc.Code Ann. § 5–309) applies to a salaried emergency medical technician.

## The Facts and Proceedings

Norman Tatum, Jr. had a long history of moderate to severe asthma. Just after midnight on September 21, 1981, he experienced another severe asthma attack. He called the Prince George's County Fire Department and requested emergency assistance.

After arriving at the Tatum household, the paramedics, Gregory Gigliotti (defendant-appellee) and Richard Miller encountered Tatum, who was agitated and breathing in and out rapidly. They tried to place a paper bag over Tatum's face, an emergency treatment for hyperventilation, but he resisted this effort. The paramedics administered oxygen to Tatum when the paper bag technique failed to calm him. They then escorted Tatum to the ambulance, rather than transport him by stretcher. At trial, Gigliotti testified that

this was due to the unsafe condition of the area over which Tatum would have to be transported.

Enroute, Gigliotti testified that he tried to administer oxygen, but Tatum again resisted. Tatum did hold the oxygen mask in his hand but dropped it when he got off the stretcher to sit on the ambulance jump seat. Gigliotti further related that when the ambulance turned the corner to enter the grounds of the hospital, Tatum slid off the bench seat and fell down onto the floor of the ambulance.

As the ambulance stopped in front of the emergency door entrance, Miller and Gigliotti placed Tatum on the ambulance stretcher and rushed him into the hospital. After the emergency technical staff from the emergency room arrived, they started administering medical treatment to Tatum.

The Prince George's County ambulance report stated that upon arrival at the hospital "Mr. Tatum was conscious, stable, pupils normal, and pupils were equal." The report was signed by Gigliotti. The emergency room nurse, however, testified that Tatum was in complete respiratory and cardiac arrest when she encountered him.

The physician who performed the post-mortem examination testified that Tatum died from cerebral edema, secondary to anoxia from status asthmaticus with respiratory arrest. When asked, *inter alia*, "whether the administration of oxygen in the ambulance would have permitted Norman Tatum to survive this attack?," he responded in part that "lack of oxygen is the main reason why Mr. Tatum showed the findings that he showed at autopsy, and I infer from that caused his death...."

Appellant, Elizabeth Tatum, filed an action as Personal Representative of the Estate of Norman Tatum, Jr. for wrongful death and a survival action against Gigliotti, Miller, and Prince George's County. Prior to trial, the claims against Prince George's County, Maryland were dismissed on the basis of governmental immunity and the claims against Miller were dismissed on the basis that

notwithstanding service upon the correct defendant the first name of Mr. Miller was incorrectly set forth on the Complaint. The case was tried by a jury against Gigliotti alone, culminating in the declaration of a mistrial and the granting of judgment for the defendant [1] by the presiding trial judge when the jury was unable to reach a verdict.

On appeal, this court must determine whether the trial court erred:

1. In applying the "Good Samaritan" statute's gross negligence standard to defendant's action;

2. In holding that insufficient evidence was presented of gross negligence to require submission of the case to the jury;

3. In excluding Anna Christine Niblack as an expert witness;

4. In excluding a demonstration videotape;

5. In not permitting appellant's expert to testify as to the "clear and unmistakable duties" of an emergency medical technician;

6. In granting Defendant Prince George's County's motion for summary judgment based on "sovereign" immunity; [2]

7. In allowing testimony as to the decedent's medical record of mental difficulties;

8. In allowing the testimony of Dr. Slye regarding the standard of care of emergency medical technicians;

9. In its answer to the jury's inquiry as to whether gross negligence can be judged without malicious intent; and

10. In allowing cross-examination questions which referred to evil intent.

---

1. *See* Rule 2–519(d).

2. Appellant incorrectly refers to the term "sovereign" immunity as applied to Prince George's County. While the State of Maryland may enjoy "sovereign" immunity under certain circumstances, a county or other subdivision of the state cannot.

■ We consider initially the applicability of the Good Samaritan Statute's gross negligence standard to defendant's actions. Resolution of this question is central to this appeal since the testimony in this case indicates that although the actions of defendant Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence. On this basis, the trial judge granted defendant's motion for judgment.

Appellant argues that this statute does not apply to defendant, a salaried emergency medical technician operating within his assigned duties.

Based on the legislative development of the Good Samaritan statute and the plain meaning of its words, we hold that it does encompass the actions of the defendant.

We find no merit in appellant's other contentions and therefore affirm the decision of the trial court.

### 1. *Good Samaritan Statute*

At the time of the incident, in 1981, the applicable statute was Article 43, § 132, of the Annotated Code of Maryland, which provided, in pertinent part, as follows:

(a) A person licensed by the State of Maryland to provide medical care, who renders medical aid, care, or assistance *for which he charges no fee or compensation:* (1) at the scene of an emergency; (2) in transit to medical facilities; or (3) through communication with personnel rendering emergency assistance is *not liable for any civil damages as the result of any professional act or omission by him not amounting to gross negligence.*

(b) A member of any state, *county,* municipal or volunteer *fire department,* ambulance and rescue squad, or the National Ski Patrol System, or law enforcement agency who has completed an American Red Cross course in advanced first aid or its equivalent and possesses a current card indicating that status as determined by the Secretary of Health and Mental Hygiene, *or is certified by the State of Maryland as an emergency medical technician* or cardiac rescue technician *has the same*

*immunity provided in subsection (a).* A volunteer fire department or ambulance and rescue squad has the same immunity as its members.

(Emphasis added.)

Appellant argues that by its terms the Good Samaritan Statute did not apply to services undertaken as a part of the defendant's duties, for which duties a salary was being paid. Specifically, appellant refers to the language of the statute, "renders medical care, or assistance for which he *charges no fee or compensation."* He asserts that defendant's salary amounts to "compensation" under the statute.

Appellant cites two out-of-state cases where the respective courts found that the relevant "good samaritan" statute did not apply to a particular defendant; in one case to doctors in a hospital emergency response team, *Colby v. Schwartz,* 78 Cal.App.3d 885, 144 Cal.Rptr. 624 (1978), in the other to a policeman acting within his assigned duties; *Lee v. State,* 490 P.2d 1206 (Alaska 1971). These cases are inapposite. In *Colby, supra,* the court held that the relevant statute was inapplicable because defendants acting in this capacity did not render the type of physical care which constituted "emergency care" as it is used in the statute. In *Lee, supra,* the court's analysis centered around whether the defendant had a statutory duty as a police officer to aid someone in an emergency. In neither case was statutory language concerning compensation even an issue.[3]

The original Good Samaritan Law in Maryland was enacted in 1963 by Chapter 65, Laws of Maryland 1963; it provided protection in certain circumstances only to "a physician licensed to practice medicine by the Board of Medical Examiners of the State of Maryland." The next

---

**3.** *But see Held v. City of Rocky River,* 34 Ohio App.3d 35, 516 N.E.2d 1272, 1276 (1986), in which the court recognized
that a Good Samaritan statute, which excluded care or treatment rendered for payment or expectation of payment, expressly did not consider the care or treatment provided by paid law enforcement officers or firefighters as care rendered for payment or expectation of payment within the meaning of the statute.

year the law was amended by Chapter 48, Laws of Maryland 1964, to add coverage for trained "members of volunteer ambulance and rescue squads." In 1965 the General Assembly enacted Chapter 475, Laws of Maryland 1965, which expanded the law to include registered nurses and licensed practical nurses. Chapter 616, Laws of Maryland 1969, added coverage for members and employees of fire departments or ambulance and rescue squads. Of interest to our analysis is the fact that the legislature dropped the word "volunteer" that preceded "ambulance and rescue squads" when it amended the law in 1969.

In 1970 the General Assembly completely revised the "Practitioners of Medicine" subtitle in Article 43, which contained the Good Samaritan Law. That law was renumbered as § 132 of Article 43, but otherwise was left basically intact. Finally in 1976, the General Assembly repealed and reenacted the Good Samaritan Law, consolidating the various provisions that had been enacted over the years into four subsections found in the applicable statute at the time of this incident.

The issue before us was cogently addressed in 64 *Opinions of the Attorney General* 175 (1979), which states,

> [W]e do not believe that the payment of a salary to several of the paramedics runs afoul of the restriction on charges and compensation. The whole statutory scheme reflects the principle that, if the victim is charged for the help by the person seeking immunity, then no immunity is available under the Good Samaritan Law; but, if the victim is not charged by the one rendering the assistance and seeking immunity, then *even a salaried employee is entitled to immunity absent gross negligence.*

(Emphasis added.) Although this opinion is in no way binding, we find it persuasive. By subsection (b) of Section 132 it is obvious that the legislature intended "the same immunity provided in subsection (a)" for members of "any ... county ... fire department" who are emergency medical technicians where no fee or compensation was *charged.* Simply put, since "no fee or compensation" was *charged,*

Gigliotti "[was] not liable for any civil damages as the result of any professional act or omission by him not amounting to gross negligence."

This conclusion is consistent with the purpose of the legislation, which is to provide limited, civil immunity to a broad range of persons who might render emergency assistance.[4] We hold, then, that absent a charge to the victim by the person who is seeking immunity, salaried personnel do not receive "compensation" within the meaning of this section.

## 2. *Gross Negligence*

■ Having determined that the gross negligence standard is applicable, we turn to appellant's assertion that she presented sufficient proof of gross negligence to require submission of this action to the trier of fact. In *Foor v. Juvenile Services,* 78 Md.App. 151, 170, 552 A.2d 947 (1989), this court summed up Maryland case law as follows:

> Gross negligence has been equated with "wilful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others."

In *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968), the Court of Appeals, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice,* § 2771 (1946), held that "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."

Appellant argues that defendant knew of the possible fatal consequences of failure to act, knew that Tatum needed oxygen during an acute asthma attack, failed to transport him properly from the house, failed to administer

---

4.  FOR the purpose of providing for [the liability for civil damages of] *certain immunity from civil damages for* physicians, nurses, members of fire departments or ambulance and rescue squads, law enforcement officers, and other persons and organizations providing emergency medical service or care.
    Senate Bill 72, Chapter 558, Laws of Maryland 1976 (emphasis added).

oxygen to him in the back of the ambulance for a significant period of time, allowed him to remain face down on the floor of the ambulance, and finally, falsified the ambulance report. All of these taken together, she contends, satisfy the threshold of gross negligence and, therefore, the trial judge erred in entering judgment for the defendant.

We disagree. Even though the lower court, in ruling on the question of sufficiency of the evidence, is required to take the facts in the light most favorable to the plaintiff, we hold that the trial judge acted properly in granting the appellee's motion for judgment. The evidence in this case indicated that although the actions of Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence. In fact, appellant's own expert witness, Mr. Harvey Grant ("Grant"), on standard of care failed to testify that any of defendant's actions constituted a "reckless disregard for human life."

On direct examination, after being asked whether, in his opinion, defendant's actions constituted "a reckless disregard for the life of Norman Tatum, Jr.," Grant did testify that the defendant performed *"in a reckless manner."* Later, however, on cross-examination, immediately after answering in the affirmative to the above question, Grant stated, "I am not aware of the term reckless. I believe it is an improper action that could have aggravated the condition." This statement, we hold, nullified his previous responses as to recklessness. On further cross-examination, after being instructed by the court as to the correct standard, Grant declined to testify that defendant's actions constituted a reckless disregard for Norman Tatum's life. Thus, our review of the record persuades us that there were sound bases, both in law and in reason, for the trial judge's determinations that appellant failed to present sufficient evidence of appellees' gross negligence.

### 3. *Exclusion of Expert*

■ Appellant next asks us to consider whether the action of the trial court in excluding Anna Christine Niblack

as an expert witness was within its permissible scope of discretion. She wanted the witness to testify as an expert on the standard of care. The trial judge ruled that the witness could not testify as to the standard of care in 1981 since she was not a certified E.M.T. at that time. In *Potomac Electric v. Smith*, 79 Md.App. 591, 645, 558 A.2d 768 (1989), this court stated that "the test of admissibility of expert testimony is whether the expert's opinion will aid the trier of fact.... The court determines the competency of the witness to testify as to matters within his expertise." The decision to admit or exclude expert testimony is within the broad discretion of the trial judge and that decision will be sustained unless it is shown to be manifestly erroneous. *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 488 A.2d 516 (1985), *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985). The trial judge did not abuse his discretion.

### 4. *Exclusion of Videotape*

At this point, we will also address appellant's claim that the exclusion of a demonstration videotape was not within the area of discretion of the trial judge. At the time Christine Niblack was called to testify, plaintiff proffered that it had a five-minute videotape which demonstrated the use of a chair used to remove patients from houses. Appellant argues that, although admission of this type of evidence is generally within the discretion of the trial court, it is clear that this ruling was made solely on the basis that a considerable period of time had gone by between the occurrence and the taking of the videotape.

This argument has no merit. The record indicates that the videotape was to be shown in conjunction with Christine Niblack's testimony. In discussing with counsel the admissibility of her testimony demonstrating the use of a chair for patient transportation, the judge had just expressed his reservations about the *relevance* of such a demonstration, not just the intervening time sequence between event and demonstration. "Evidence, to be admissible, must be relevant and a determination as to relevance is left to the

discretion of the trial judge." *Schear v. Motel Management Corp.*, 61 Md.App. 670, 682, 487 A.2d 1240 (1985).

### 5. *Questions to Expert*

■ Appellant's next contention is that the trial court erred in not permitting appellant's expert, Grant, to testify as to the "clear and unmistakable duties" of an emergency medical technician. She argues that this ruling effectively precluded her expert from expressing an opinion which related to the ultimate issue and constitutes reversible error. Appellant is wrong. The issue at hand is whether defendant's actions constituted a reckless disregard for human life. The question was posed as follows:

> Now, based upon the deposition and the autopsy report that you read, would you have an opinion within a reasonable degree of certainty as to whether the actions of the defendant in making Norman Tatum, Jr. breathe into a bag, in making Norman Tatum, Jr. walk down from the house where he lived, down to where the ambulance was stopped, and not giving oxygen on the way to the hospital, and in not placing Norman Tatum, Jr. on the stretcher after he come off are contrary to the clear, unmistakable duties of an EMT as they existed in 1981?

The breach of duties of an E.M.T. is not, *per se*, tantamount to gross negligence. "The admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Stebbing v. State*, 299 Md. 331, 473 A.2d 903, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

In any event, after further objections and colloquies between the court and counsel, the inquiry *sub judice* evolved into the question posed to Grant and discussed in part "2," *supra*. Ultimately, Grant could not testify that Gigliotti's alleged transgressions amounted to a reckless disregard for human life.

### 6. *"Sovereign" [Governmental] Immunity*

■ Appellant's next question is whether the trial court erred in granting Prince George's County's motion for

summary judgment based on "sovereign" immunity.[5]

Generally, charter counties such as Prince George's County are entitled to assert the defense of governmental immunity in regard to the alleged tortious conduct of the county, its agencies, servants and employees. Section 1013 of the Charter of Prince George's County, enacted in 1970, addressed the issue of the County's governmental immunity. Since that time, however, Section 1013 has undergone several modifications.

Appellant asserts that the latest amendment to this section resulted in the County fully waiving its governmental immunity.[6]

This court recently considered this very issue in *Prince George's County, Maryland v. Surratt*, 80 Md.App. 415, 564 A.2d 95, 99–100 (1989), and held that "§ 1013 is invalid in its entirety." Therefore, Prince George's County has. made no effective waiver of its governmental immunity. *See also Walker v. Prince George's County*, 667 F.Supp. 1103 (D.Md.1987).

■ Appellant's further claim that Judge Blackwell's original ruling, denying the motion, became the "law of the case" and could not be disturbed by a subsequent trial

---

**5.** Appellee argues that, pursuant to Maryland Rule 8–202, an appeal of this order had to be filed within 30 days after the entry of this order and, therefore, this appeal is untimely. He is mistaken. We refer him to Maryland Rule 2–602(a). *See also Planning Board v. Mortimer*, 310 Md. 639, 530 A.2d 1237 (1987).

**6.** The 1986 amendment states as follows:

The County may be sued in actions sounding in tort *only for those occurrences* for which its officers, agents, and employees may be liable ... *The sentences, clauses, or phrases of this section shall not be severable. If any such sentence, clause, or phrase of this section is declared unconstitutional or invalid for any reason, then it is intended by the people of the County that the entire section be declared invalid.*

Section 2. BE IT FURTHER ENACTED that the amendment hereby proposed shall be binding on all cases in which a judgment has not been entered as of the date of adoption of the amendment....

(New language emphasized.)

judge is also without merit. The "law of the case" doctrine is inapplicable here. The Court of Appeals has clearly stated that, "As a general principle, one judge of a trial court ruling on a matter is not bound by the prior ruling in the same case by another judge of the court; the second judge, in his discretion, may ordinarily consider the matter de novo." *State v. Frazier*, 298 Md. 422, 449, 470 A.2d 1269 (1984). The trial judge acted properly in granting Prince George's County's motion for summary judgment based on governmental immunity.

### 7. *Decedent's Mental Illness History*

■ Appellant contends that the trial court erred in allowing testimony as to the decedent's medical record of mental difficulties. He argues that this information should not have been admitted because it was highly prejudicial and there was no connection between the information introduced and an issue in the case. Again, we find no merit in this claim. One of the issues that appellant had raised was whether appellee was grossly negligent in not placing an oxygen mask over decedent's face. Appellee asserts that decedent twice resisted attempts to place a mask on his face. It is appellee's contention that the fact that decedent was diagnosed as suffering from schizoid paranoia was related to his resistance. In fact, appellant's witness, Dr. Scanlon, testified on cross-examination that one suffering from such a mental illness would be more likely to resist the use of a face mask. Thus, evidence of decedent's mental illness was relevant.

### 8. *Testimony of Appellee's Expert Witness*

■ Finally, appellant asks us to decide whether the trial court erred in allowing the testimony of appellee's expert witness, Dr. Slye, regarding the standard of care of emergency medical technicians.

Appellant argued at trial that Dr. Slye not be permitted to testify as an expert on the standard of care for emergency medical technicians. The court ruled that any licensed

physician is an expert in emergency medical techniques. We hold that this ruling was within the court's discretion.

We wish, however, to comment further as to why allowing Dr. Slye's testimony was proper. Dr. Slye was qualified as a physician with a specialization in allergies. Dr. Slye pointed out in his testimony that the treatment of asthma was part of his specialization in allergy and immunology. Appellant stipulated that Dr. Slye was an expert in those areas.

When Dr. Slye testified that it would not be desirable to restrain an individual with asthma who (i) refuses to remain strapped to an ambulance stretcher and (ii) refuses to use an oxygen mask, he was not giving an expert opinion as to emergency medical techniques but rather giving an opinion on rendering medical aid to an individual having an asthmatic attack. It certainly is reasonable that a physician, familiar with the treatment and care of individuals with asthma, could render such an expert opinion. Thus, we are convinced that the court's ruling was proper.

### 9. *Instruction to Jury and "Misleading" Cross–Examination Questions*

We dismiss appellant's final two claims as moot. This court is asked to decide whether the trial court erred in its instructions to the jury on gross negligence and whether cross-examination questions referring to evil intent misled the jury. Since judgment, based on insufficiency of the evidence, was entered by the court after a mistrial (see Rule 2–519(d)), and neither of these issues affect sufficiency of the evidence, they are moot.

We also need not consider two additional issues, although properly raised, that *appellee* argues in his brief as grounds for affirmance since we have affirmed the lower court's decision.[7]

---

7. It is established as a general principle that only a party aggrieved by a court's judgment may take an appeal and that one may not appeal or cross-appeal from a judgment wholly in his favor. *Adm'r, Motor Veh. Adm. v. Vogt,* 267 Md. 660, 664, 299 A.2d 1 (1973).

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

[However, w]here a party has an issue resolved adversely in the trial court, but like the appellee here receives a wholly favorable judgment on another ground, that party may, as an appellee and without taking a cross appeal, argue as a ground for affirmance any matter that was resolved against it at trial.
*Offutt v. Montgomery Co. Bd. of Ed.*, 285 Md. 557, 564 n. 4, 404 A.2d 281 (1979).