642 A.2d 879

**Archie WELLS, et al.**

v.

**STATE of Maryland.**

No. 1545, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 10, 1994.

Andrew G. Slutkin (Robert J. Weltchek, Amy B. Chappell, Dominick A. Garcia, Baltimore, and Carl R. Gold, Towson, on the brief), for appellants.

Diane Krejsa, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Shelly Mintz, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and ALPERT and FISCHER, JJ.

WILNER, Chief Judge.

Through his new, adoptive parents, young Dominick Jenkins sued the State of Maryland, a number of supervisory personnel employed either by the State Department of Human Resources or the Baltimore City Department of Social Services (DSS), and some direct care social workers employed by DSS. He sought recompense for their alleged failure to prevent the repeated infliction of abuse upon him by his mother and her boyfriend.

The complaint, filed in the Circuit Court for Baltimore City, contained nine counts, including ones for negligence (Counts I

and II), gross negligence (Counts III and IV), violations of Federal statutory rights and procedural and substantive due process rights under the 14th Amendment, enforceable through 42 U.S.C. § 1983 (Counts V and VI), violations of procedural and substantive due process rights under the Maryland Constitution (Count VII), intentional infliction of emotional distress (Count VIII), and, on an unarticulated theory, for the recovery of medical expenses (Count IX). The circuit court dismissed each count for various reasons expressed in a motion to dismiss filed by the defendants.

Appellants have accepted the court's rulings on five of the nine counts, or at least have not appealed those rulings; this appeal focuses on Counts III, IV, VI, and VII. We are not concerned, therefore, with whether appellants have stated a cause for relief grounded on simple negligence under the Maryland Tort Claims Act, for that is no longer relevant.[1] The issues are:

(1) whether appellants adequately pled gross negligence against the individual defendants;

(2) whether the State child protection laws create an independent statutory duty on the part of the individual defendants to prevent children such as Dominick from abuse inflicted by third parties and whether appellants sufficiently pled a breach of that duty; and

(3) whether Dominick has Federal or State due process rights that were violated by the individual defendants.

The second and third issues, as we shall see, overlap.

### State Law And Policy

Whether appellants have stated a cause of action under any of the theories they continue to pursue depends ultimately on

---

1. One of the principal rulings of the circuit court was that appellants had failed to comply with the notice requirements of the State Tort Claims Act. Appellants do not contest that ruling, which served to remove the State as a defendant and to require appellants to establish a basis of liability other than simple negligence against the individual defendants. The circuit court found no other basis.

whether, taking the averments in the complaint as true, appellants have shown the violation by the defendants either of a legally cognizable duty they owed to Dominick or an entitlement possessed by Dominick. Both the duty and the entitlement asserted arise from what appellants refer to as the "Maryland Child Protection Statutes." In fact, their reliance seems to be as much on regulations adopted by the Department of Human Resources as on the statutes themselves. To provide a proper framework within which to consider the factual underpinnings of the case and the legal issues presented, we shall begin with an examination of the law from which the asserted duty and entitlement allegedly flow.

The unfortunate events here occurred over a seven year period—from 1979–1986—during which the relevant statutes and regulations were amended several times. At all times, however—initially in Md.Code, art. 27, § 35A and later in Fam. Law art., title 5, subt. 7—there existed laws requiring the reporting, investigation, and remediation of child abuse. The stated purpose of those laws was "the protection of children who have been the subject of abuse by mandating the reporting of suspected abuse, by extending immunity to those who report in good faith, by requiring prompt investigations of such reports and by causing immediate, cooperative efforts by the responsible agencies on behalf of such children." Art. 27, § 35A (1976 Repl.Vol.); current Fam. Law art. § 5–702 (1991 Repl.Vol.)

To carry out that purpose, the law first required persons having reason to believe that a child has been abused to report the suspected abuse to the local department of social services (DSS) or to a law enforcement agency. "[P]romptly upon receiving a report of probable violation," the agency (we shall focus here on DSS) was required to make "a thorough investigation," the primary purpose of which "shall be the protection of the welfare of the child or children." Art. 27, § 35A(f); Fam. Law art. § 5–706(a). The investigation must include a determination of the nature, extent, and cause of any abuse, and, upon validation of the suspected abuse, the identity of the person(s) responsible for it, the name, age, and condition of

other children in the household, an evaluation of the parents and home environment, and all other pertinent facts. Based upon its findings, DSS "shall render the appropriate service in the best interests of the child, including, when indicated, petitioning the juvenile court in behalf of the child for the added protection to the child which either commitment or custody would provide." Art. 27, § 35A(g); Fam. Law art., § 5–710(a). Effective October 1, 1984, the law was amended to require DSS, within 24 hours after receiving a report of suspected abuse, to see the child, attempt an on-site interview with the child's caretaker, and decide on the safety of the child and other children in the home. 1984 Md.Laws, ch. 611; Fam. Law art. § 5–706(b).

In furtherance of these statutory mandates, regulations were adopted, and from time to time amended, by the Department of Human Resources (COMAR, title 7, subt. 02, ch. 07). At least since 1979, DSS was required under these regulations to complete its initial investigation within 10 days after receipt of a report and to determine whether the reported abuse is (1) "confirmed," meaning that there is credible and specific evidence, of a nature that could be sustained in court, that non-accidental injury or sexual abuse has occurred, (2) "indicated," meaning that, based on various "indicative factors" set forth in the regulation, there is strong suspicion based on reasonable judgment that abuse occurred, (3) "uncertain," meaning that it is not possible at the time the investigation is completed to determine whether abuse occurred, or (4) "ruled out," meaning that there was no injury or that injuries "clearly have been accidentally caused." COMAR 07.02.07.05A(b); 6 Md.Reg. 1059–60 (1979). DSS was also required to reach a decision with the family concerning a plan to meet the needs of the child within 30 days, and, during that 30–day period, to interview the family in their home as frequently as necessary. Various internal procedures were also required.

These statutory obligations, supplemented by the regulations, form the basis of the duty and the entitlement alleged by appellants. They assert, essentially, that Dominick was part of a specific protected class—a child in a home where

suspected abuse had been reported against him and against his sister.

## Factual Allegations

The complaint is 60 pages long and contains 186 numbered paragraphs. Attached to it are two exhibits—a September, 1984 Confidential Report to the Secretary of Human Resources from the Secretary's Foster Care Task Force detailing certain fiscal and managerial deficiencies in the foster care system in Baltimore City (the 1984 report), and an April, 1986 Confidential Report to the Secretary from the Social Services Administration and the Attorney General's Office concerning the conduct of DSS and some of the defendants in this case in investigating allegations of child abuse perpetrated against Dominick's sister, Myeshia Jenkins (the 1986 report). Because those reports are referred to in the complaint and are attached as exhibits, we shall regard them as part of the complaint.

The complaint is not easy to read with any substantial degree of emotional detachment. It presents a saga of physical abuse suffered by these defenseless children throughout most of their lives, leading ultimately to the torture and death of Myeshia at the age of nine, and a deeply disturbing dereliction on the part of DSS in failing to take effective remedial action when there existed within the Department adequate warning that the children—especially Myeshia— were at risk. We shall but summarize the relevant allegations.

Myeshia was born in December, 1976 to Michael and Paulette Jenkins, themselves still teenagers. Dominick was born in June, 1979. In December, 1978, Michael and Paulette separated, and Myeshia and her mother took up residence with one Houston Lanteon. Four days after Dominick was born, Michael, after observing bruises on Myeshia's arm, filed a child abuse complaint with DSS. Defendant Cook, a DSS social worker, promptly investigated the complaint. Although he was unable to see the bruises, he was informed by Paulette

and her mother that Lanteon had beaten the two-year-old child for urinating on the floor. Cook was also informed that Lanteon was a violent man and that he had beaten Myeshia on prior occasions.

Cook reported that abuse was "indicated," but, apparently because Paulette and her children left Lanteon and moved to new quarters, he took no remedial action. In March, 1980, having received no further reports of abuse, he closed the file, even though, through a home visit in February, he became aware that Paulette and Lanteon were again living together, with the children. That episode constitutes the first report of abuse to DSS.

It is alleged in the complaint that, in the fall of 1981, Michael Jenkins again called DSS and asserted that Myeshia and Dominick were being physically abused, that he was assured by "[t]he Defendants" that they would "check into the alleged abuse," but that "they took no action properly to investigate the allegations." Appellants do not indicate exactly who Mr. Jenkins spoke to on this occasion or what, precisely, he reported. There is no reference to this conversation in the 1986 report.

A third report of abuse involving Myeshia was made in January, 1983. Her teacher informed DSS that Myeshia had come to school crying, reporting that her father had hit her, and that there were bruises and swelling on the child's face. This report was investigated by defendants Duffie and Zinkand, who determined that abuse was "uncertain." They did not see any evidence of abuse, and both Myeshia and Paulette denied that the child had been beaten. Though aware of the 1979 report, Duffie and Zinkand took no further action.

The fourth report was made a month later, in February, 1983. The principal of Myeshia's school informed DSS that Myeshia had not been to school for a week and that Lanteon had offered as an explanation that the child had hurt both of her feet. Upon this report, defendant Duffie visited the home and observed infected second and third degree burns on both of Myeshia's feet and legs. Duffie took Paulette and the child

(along with Lanteon) to the emergency room at South Baltimore General Hospital for treatment. Myeshia and Paulette stated that the injuries resulted from the child's having stepped into the bathtub without testing the water. When the attending physician indicated that that explanation was compatible with the injuries noted, Duffie concluded that abuse was "ruled out," notwithstanding a formal abuse report submitted by the hospital. Duffie had both children undergo a complete physical examination but took no other action.

In March, 1983, an anonymous caller reported seeing Myeshia banging on the window inside her home and related that the child told the caller that she and Dominick had been left alone for the weekend and told not to leave the house. This, of course, was an allegation of neglect, rather than abuse. It was alleged that defendants Duffie, Lowrey, and Goldstein, all DSS employees, failed to make a proper investigation. According to the April, 1986 report (Exhibit 2 to the complaint), however, the complaint was investigated, and, after Paulette and Myeshia denied the allegation and school personnel reported that there were no problems, neglect was "ruled out," and the case was closed.

The sixth report came a year later, in March, 1984. Myeshia was referred to the Walter P. Carter Center, a mental health facility, when it came to light that she was having oral sex with four-year-old Dominick. Paulette and Lanteon told the Center's intake worker that they had spanked both children and made Myeshia lie in a dry bathtub and stay in a closet at night. The intake worker reported this to DSS and also reported that the children had been beaten with a belt by both Paulette and Lanteon. During a home visit on April 3, 1984, defendant Stanley Jenkins, a DSS social worker assigned to the case, noticed belt loop marks on the children's backs. Lanteon confirmed that he had hit the children. Myeshia told Jenkins that she had been encouraged to have oral sex with Dominick.

On this information, Mr. Jenkins "confirmed" abuse and recognized that monitoring was required. Accordingly, in

May, the case was assigned to the Child Protective Services Division of DSS. Even though the case was assigned a priority rating of "2"—the second highest risk category—it was not until September, 1984 that the supervisor of that Division, the defendant Anderson, got around to assigning it to a case worker. During that interim, no follow-up occurred. At the time, according to the April, 1986 report, the continuing services unit in the DSS southwest region, where this family lived, had 188 cases and only two social workers; the Jenkins case was among 39 unassigned cases, 17 of which were priority 2 cases. The complaint alleges that Myeshia and Dominick "were subjected to continual physical abuse during this time."

No home visits were even attempted until November, 1984, and it was not until December that one actually occurred. During the following year, defendant Jay visited the home seven times and attempted four other visits. He observed no sign of further abuse and received no reports of any. He and his supervisor were on the verge of closing the case.

On December 20, 1985, Myeshia was taken to South Baltimore General Hospital with a broken arm. She, Paulette, and Lanteon all said that the child had fallen down the stairs. Although the complaint (¶ 112) alleges that, according to the hospital records, DSS was contacted because the hospital suspected abuse, the April, 1986 report states that DSS was not contacted and did not learn of the incident until after Myeshia's death three months later. We accept that statement, which forms part of the complaint and thus raises an inconsistency or ambiguity, as true: "any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Sharrow v. State Farm Mutual*, 306 Md. 754, 768, 511 A.2d 492 (1986).

The final, tragic episode occurred on March 6, 1986. As described in ¶¶ 114–116 of the complaint:

"114. On or about March 6, 1986, when she was nine (9) years old and still living with her mother and Houston Lanteon, Myeshia Jenkins was brutally and predictably

murdered by Houston Lanteon ... while her mother, Paulette Jenkins, aided and abetted the murderer. Specifically, Myeshia was beaten over 100 times with a belt by Houston Lanteon in the presence of Paulette Jenkins, left for a period of time lying in a bath tub of water, and kicked and otherwise beaten.

115. The beatings were so severe that imprints from the belt's stitching and buckle were found on Myeshia's face and body. Myeshia lay in agony for hours before she died of severe injuries to the head and body, with hypothermia a possible contributing cause.

116. Dominick Jenkins was also subject to severe beatings on the day of his sister's death and throughout the period from June 1979 until his eventual removal from the Jenkins household in 1986. Moreover, Dominick Jenkins was forced to witness his sister's murder, and continues to suffer psychological injury as a result of that trauma."

The complaint alleges that the individual DSS employees failed, with respect to each of the earlier reported episodes, to take proper corrective action—to make a sufficient investigation in light of what they knew of the current episode and the history of earlier episodes, to develop service plans for the family, and to monitor the situation. Incompetence, gross negligence, and indifference is alleged on the part of both the supervisory employees and the direct care workers. The issue, of course, is whether these allegations are legally adequate in terms of what is required to establish civil liability.

### Gross Negligence

In *Foor v. Juvenile Services*, 78 Md.App. 151, 170, 552 A.2d 947, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989), we summarized the case law defining the concept of gross negligence. We said:

"In *Bannon v. B. & O. R.R. Co.*, 24 Md. 108, 124 (1866), the Court observed that '[g]ross negligence is a technical term: it is the omission of that care "which even inattentive and thoughtless men never fail to take of their own property," it

is a violation of good faith.... It implies malice and evil intention.'

That standard has remained more or less intact. Gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.' ... In *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12 (1968), the Court, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946), held that 'a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.' ... When dealing with such a standard, bald and conclusory allegations will not suffice; specificity is required."

*See also Tatum v. Gigliotti*, 80 Md.App. 559, 565 A.2d 354 (1989), *aff'd*, 321 Md. 623, 583 A.2d 1062 (1991).

The specific derelictions alleged against the individual defendants are set forth in ¶¶ 61–133 of the complaint. In Counts III and IV, comprising ¶¶ 149–160, appellants simply add that those acts or omissions were committed willfully, wantonly, and with reckless disregard of Dominick's rights. That characterization is, of course, a conclusory one; whether appellants have sufficiently pled wantonness or wilfulness must be determined by the more specific allegations. In that regard, the defendants are not fungible; we must examine what each is charged with doing or failing to do.

Count IV, dealing with the supervisory defendants (Massinga, Farrow, Duva, Musgrove, Rosinski, Jones, Bernard, Warner–Burke, and Anderson) is particularly vulnerable. Several general allegations are made, all concerning their knowledge that DSS was understaffed, underfunded, and not well managed. The lack of resources, appellants claim, was known to them as early as 1979, although appellants do not indicate what these defendants could have done to remedy that lack. They claim that, by November 6, 1985, these employees were aware that the protective services system within DSS was in disarray, that, as a result, children were not being protected,

and that they failed to "take reasonable steps to establish an effective program for dealing with child abuse in Baltimore City." Specific reference is made to the 1984 report, attached as Exhibit 1 to the complaint, and the failure of the supervisory employees to implement recommendations made in that report.

The report in question was dated September 24, 1984, which, like the alternate date of November, 1985, was *after* every one of the reported incidents of abuse alleged in the complaint, other than the final one. The investigation leading to the report apparently arose from a case of reported abuse by foster parents, and the report itself dealt primarily with monitoring the foster care system to assure that children placed in foster care were not being abused by their foster parents. Most of the recommendations made in the report concerned the selection, screening, and monitoring of foster homes and parents, much of which would require additional funding and staff training. The relevance of that report to the investigation and monitoring of suspected abuse within the child's own home is largely tangential.

In summary, appellants have failed, completely, to allege the kind of wanton, wilful, or reckless conduct on the part of these supervisory defendants toward Dominick necessary to sustain an action for gross negligence.

The case against Cook and Steinberg concerns only the first report of abuse, involving only Myeshia, in June, 1979. The charges are that they (1) failed to obtain a psycho-social history of Paulette and Lanteon, to develop a service plan, and to maintain personal contact with the household, and (2) closed the case with knowledge that Lanteon was back in the household.

Duffie, Zinkand, Lowrey, and Goldstein are charged with dereliction in connection with the events in January, February, and March, 1983. The reports in January and February concerned only Myeshia. All three reports, as noted, were investigated; the first, involving bruises to Myeshia's face, led

to a finding that abuse was uncertain; as to the other two, the defendants "ruled out" abuse.

Appellants allege that the closing of the file upon a finding of uncertain abuse in January was grossly negligent because of the defendants' awareness of "the developing pattern of abuse." As to the February incident, involving the burns to Myeshia's feet and legs, Duffie and her unnamed supervisor are charged with accepting Myeshia's explanation, supported by Paulette and Lanteon, and failing to make a further investigation in light of a formal report from the hospital. The complaint, itself, does not indicate the contents of that hospital report; the April, 1986 report, however, states that the "attending hospital physician felt that the child's explanation was compatible with the extent and type of burns she sustained." The March incident, as noted above, involved an anonymous call that the children had been left alone for a weekend; the social worker was told by Myeshia and Paulette that such was not the case.

The March, 1984 incidents—the oral sex and the subsequent discovery of belt-beatings—involve defendants Jenkins, Anderson, Bass, and Jay. Jenkins is charged with some unarticulated and unclear complicity in the delay in assigning responsibility for the case upon its transfer to the child protective services unit, although appellants allege that Anderson was the person responsible for that unit. Anderson is charged more directly with failure to properly supervise the unit and assign the case. Jay was the worker eventually assigned; he is charged with visiting the home only seven times rather than weekly. As we observed, the April, 1986 report indicates that he attempted four additional visits. Appellants also complain that he failed to order a psycho-social history report. Bass, who was Jay's supervisor, is charged with failing to supervise him.

These allegations, taken in a light most favorable to appellants, suggest individual negligence and bureaucratic mismanagement and incompetence; they suggest a critically important governmental unit not properly doing its job because of

underfunding, understaffing, lack of effective leadership and supervision, lack of training, and lack of clear procedures and protocols. They do not indicate, however, malice, evil intention, or wanton, wilful, or reckless disregard for human life or the rights of others. In short, they do not allege gross negligence on the part of any of the defendants.

## State Statutory Duty

The circuit court, having concluded that appellants failed to comply with the notice requirement of the Tort Claims Act or adequately to plead malice or gross negligence, found it unnecessary to determine whether the defendants were under a statutory duty to Dominick by reason of the State child protection statutes. It nonetheless considered the issue and found that no such duty existed.

But for the Federal and State due process claims made by appellants, it would indeed have been unnecessary to consider whether a statutory duty was violated. If such a duty exists, the violation of it would be a tort. *See*, in general, *Prosser and Keeton on Torts*, 5th ed. § 36 (1984). Md.Code, Cts. & Jud.Proc. art., § 5–399.2(b) provides that State personnel are immune from suit in Maryland courts and from liability for tortious conduct (1) committed within the scope of their public duties, (2) committed without malice or gross negligence, and (3) for which the State has waived immunity. The individual defendants are State personnel; the acts or omissions charged to them were within the scope of their public duties; the conduct was not, based on the allegations of this complaint, the product of malice or gross negligence; and the State has waived its immunity with respect to this kind of tort. Even though appellants cannot proceed against the State because of their failure to satisfy the procedural prerequisite of notice, the individual defendants have, and retain, their immunity. *Simpson v. Moore*, 323 Md. 215, 592 A.2d 1090 (1991). For these reasons, we conclude that liability cannot be predicated directly on the alleged violation of the child protective service laws.

### Due Process Claims

█ Appellants attempted to establish Constitutional or quasi-Constitutional claims in Counts V, VI, and VII. Count V was based on the assertion that the defendants owed specific duties to Dominick under various Federal welfare statutes, enforceable through 42 U.S.C. § 1983. The circuit court dismissed Count V on the ground that no Federally protected individual rights were created under those statutes. That ruling has not been appealed.

In Count VI, appellants asserted that the State statutes and regulations described above gave Dominick a legitimate expectation of receiving protection from abuse and that that expectation created a Constitutionally protected liberty or property interest. The transgression of that interest, they assert, amounts to a deprivation of Dominick's Federal right to substantive and procedural due process of law. Count VII asserts the same theory under the analogous State Constitutional right to due process. Appellants acknowledge that, because the Federal and State due process rights are essentially the same, the resolution of Count VI will also control Count VII.

In *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court rejected an attempt to transmute State child protection laws such as those at issue here into a Federal Constitutional obligation on the part of the States to prevent, investigate, or remediate child abuse. There too a child who was brutally and systematically beaten by his father sued social workers and other local officials for failing to remove him from his father's custody. That failure, he claimed, deprived him of liberty in violation of the due process clause of the 14th Amendment.

The facts in *DeShaney* were even more egregious than those here, at least as to Dominick, in terms of the injuries periodically inflicted on the child, what DSS knew or should have known, and the callous lack of effective action on the agency's part. The Court characterized the child's claim as

being that the defendants were "categorically obligated to protect him in these circumstances." *Id.* at 195, 109 S.Ct. at 1003. It responded, however:

"But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text."

On this premise, the Court concluded, at 196–97, 109 S.Ct. at 1003–04 that:

"If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."

(Footnote omitted.)

The Court then considered, and rejected, the child's further argument that, even if no duty existed to provide the general public with protective services, a duty did exist to him because of the "special relationship" arising from the State's knowledge that the child faced a special danger of abuse from his father and its proclaimed intention to protect him against that danger. In effect, the Court found no such "special relationship" from which such a Constitutional duty would flow. At 202–03, 109 S.Ct. at 1007, the Court explained:

"Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua

and his mother to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them. In defense of them it must also be said that had they moved too soon to take custody of the son away from the father, they would have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection."

Appellants seize upon a footnote in *DeShaney* to declare that case inapposite. In discussing the broad due process claim made there, based on a liberty interest, the Court observed that the petitioners were also arguing that the Wisconsin child protection statutes gave the child "an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under our decision in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972)." The Court declined to consider that argument because it was presented for the first time in the petitioners' brief and was not pled in their complaint. Appellants have raised that issue in their complaint, and we therefore need to address it.

We need to keep this argument in perspective. The Due Process Clause protects both liberty and property interests. *DeShaney* makes clear that there is no *liberty* interest created by State child protection laws—no Constitutionally-based *duty*. The "entitlement" spoken of in *Roth* implicates a *property* interest in some benefit afforded by the State. In an oft-quoted statement, the *Roth* Court made clear that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must,

instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709.

Appellants rely principally on two cases for the proposition that Dominick had an "entitlement" to compliance by the defendants with duties specified in the State child protection laws: *Turner v. District of Columbia,* 532 A.2d 662 (D.C.App. 1987); and *Mammo v. State,* 138 Ariz. 528, 675 P.2d 1347 (App.1987). Those cases (1) were grounded on simple negligence and not on the violation of any Constitutional property interest entitlement, and (2) were decided before, and therefore without reference to, *DeShaney.* In each of them, a noncustodial parent made repeated and credible complaints of child abuse to the appropriate agency, which took essentially no steps to investigate the complaints and determine whether abuse had occurred. An action was subsequently brought against the governmental entity for failure to carry out its responsibility under an analogous child protective services law. The two courts concluded that there was a duty to the endangered child to act and that the breach of that duty constituted actionable negligence. *See also Owens v. Garfield,* 784 P.2d 1187 (Utah 1989); *Jensen v. Anderson County DSS,* 403 S.E.2d 615 (S.C.1991), finding liability based on negligence in failing to comply with statutory procedural requirements.

This is the kind of action pled in Counts I and II of the complaint, counts that might have succeeded had appellants satisfied the procedural prerequisite of the Tort Claims Act.[2] Indeed, they represent a declaration of State tort law that the *DeShaney* Court itself found permissible:

"The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations like the present one. They may create such a system, if they do not

---

2. We do not suggest that appellants were in any way derelict in failing to comply with the Tort Claims Act. Notice under the statute would have been required by September 2, 1986. Appellants did not adopt Dominick until January 9, 1989, so there was no way they could have given the required notice.

have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment."

489 U.S. at 203, 109 S.Ct. at 1007; *see also Milburn v. Anne Arundel County DSS*, 871 F.2d 474 (4th Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989).

Those cases do *not* support an argument of a Constitutionally protected property interest. In point of fact, the case law since *DeShaney* has rejected the argument made by appellants and held that child protection statutes do not create a Constitutionally protected property interest within the meaning of *Roth*, at least with respect to the procedures mandated by those statutes and the regulations adopted pursuant to them. The gist of Counts VI and VII of the complaint are that Maryland law "mandates that officials and employees follow guidelines and take affirmative actions to ensure the well-being of and promote to the welfare of children threatened by abuse and neglect," and that Dominick therefore had "a legitimate expectation to receive and an entitlement to receive the protective services set forth in the Maryland Child Welfare Statutes, including, but not limited to, access to Maryland Courts and a CINA [Child in Need of Assistance] proceeding." ¶¶ 173, 174, 176.

The specific complaints made against the various defendants, as we observed, are that they failed to follow statutory and regulatory requirements governing the investigation of reported abuse or neglect and the monitoring of the children's safety. Notwithstanding the brief reference to access to the courts, appellants do not allege that Dominick had a Constitutional right—an entitlement—to be removed from the home or to have a CINA petition filed at any given point. The core contention set forth in their brief is that the defendants failed to follow procedures that, had they been followed, might have led to those results. The entitlement they seek to have recognized, in other words, is an entitlement to have the procedures created by the law followed.

The nature of the contention is important, for it is now clear that one does not have a Constitutionally-based property interest entitlement to mere procedure. In *Olim v. Wakine-kona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983), the Court noted that:

"Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.... The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent right."

(Footnote omitted.)

On that basis, the Seventh Circuit Court of Appeals, in *Doe by Nelson v. Milwaukee County*, 903 F.2d 499 (7th Cir.1990), rejected a claim just like that made here—an action by a child and his father and grandparents against a local DSS and its workers for failure to investigate complaints of child abuse in the manner required by State law and regulations. Quoting from *Olim* and from other Federal appellate decisions, the Court held, at 503:

" 'It is by now well-established that in order to demonstrate a property interest worthy of protection under the fourteenth amendment's due process clause, a party may not simply rely upon the procedural guarantees of state law or local ordinance....' Courts have observed the confusion that would result from elevating a state-mandated procedure to the status of a constitutionally protected property interest.... 'Constitutionalizing every state procedural right would stand any due process analysis on its head.' "

*See also Doe v. Hennepin County*, 858 F.2d 1325 (8th Cir. 1988); *Weller v. Dept. of Soc. Serv. for Baltimore*, 901 F.2d 387 (4th Cir.1990); compare *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990).

We concur with this approach. The violation of State-mandated procedures may well give rise to an action under State law, if the appropriate preconditions to such an action

are followed, but it does not constitute a deprivation of property without due process of law.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.

ALPERT, Judge, concurring.

I fully concur with the opinion because Maryland law offers no choice. But let the past be laid to rest with the battered body of Myeshia Jenkins. We as a people and a government should never again allow a tragedy such as that before us to be visited upon our children. There can be no excuse for our failure to muster the resources to save our children, indeed to save our society because our "... future lies in [our] most valuable resource—[our] children."

As pointed out in a recent edition of *The Maryland Bar Journal,*

The crisis that threatens the nation's children has evolved because society has neglected and abused the legal rights of children. Society has failed to protect children of all ages and socio-economic groups, not just those who are poor, hail from inner cities or are members of racial minorities. At every age, among all races and income groups, in communities nationwide, many children are at risk every day. Compounding these risks are the deficiencies of those agencies, institutions and advocacies that are designed to help. Children have become victims of a failing social and judicial system.

Evelith, *The Plight of Our Children.* XX VII Maryland Bar Journal (No. 3 May/June 1994).