**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-1034**

─────────────

ANGELO LAMONT JACKSON,

Plaintiff - Appellant,

v.

MICHAEL CARIN, Officer,

Defendant - Appellee.

─────────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, Senior District Judge. (8:19-cv-00564-PWG)

─────────────

Argued: January 26, 2024                    Decided: February 13, 2025

─────────────

Before WILKINSON, NIEMEYER, and BENJAMIN, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson concurred. Judge Benjamin wrote a dissenting opinion.

─────────────

**ARGUED:** Stephen P. Norman, THE NORMAN LAW FIRM, LLC, Dagsboro, Delaware, for Appellant. Kathryn Anne Lloyd, OFFICE OF THE COUNTY ATTORNEY, Rockville, Maryland, for Appellee. **ON BRIEF:** John P. Markovs, County Attorney, Edward B. Lattner, Chief, Division of Government Operations, Patricia Lisehora Kane, Chief, Division of Litigation, Gessesse Teferi, Associate County Attorney, OFFICE OF THE COUNTY ATTORNEY, Rockville, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

After receiving information from other law enforcement officers identifying Angelo Jackson as a suspect in a double murder in Montgomery County, Maryland, the lead homicide investigator, Detective Michael Carin, reported that information in an affidavit to support his application for a warrant to arrest Jackson. After "clearing" the application with his supervisor and the state prosecutor, Detective Carin presented it to a commissioner, who issued a warrant to arrest Jackson. After Jackson was arrested and detained, Detective Carin also testified before the grand jury, presenting the same identification information, as well as another identification made by an eyewitness. The grand jury indicted Jackson for the two murders.

As Detective Carin continued the investigation, however, he uncovered exculpatory evidence, including latent prints, DNA, and cellphone records supporting Jackson's alibi, and Carin presented that evidence to the state prosecutor. Upon receiving the DNA test results exculpating Jackson, the state prosecutor dropped all charges, and Jackson was released after having been detained for 65 days.

Jackson commenced this action against Detective Carin, alleging, in support of his federal and state claims, that Carin's affidavit in support of the warrant and his testimony before the grand jury were deliberately false or were provided with reckless disregard for the truth. Jackson also alleged that if the commissioner and the grand jury were presented with the truthful evidence then available, they would not have found probable cause for his arrest and indictment, respectively.

2

The district court, in assessing Detective Carin's affidavit, deleted from it evidence that was reasonably disputed by Jackson as false, and found that, even with that disputed material deleted, the affidavit provided probable cause to arrest Jackson. The court granted Detective Carin summary judgment on all of Jackson's claims, finding also that Detective Carin was qualifiedly immune from liability on Jackson's federal claims.

While we are sympathetic to Jackson for the mistaken identification that led to his wrongful arrest and detention, we nonetheless find that we must affirm the district court's judgment, concluding that Detective Carin did not violate the standards imposed on him by law in pursuing the investigation as he did. We also affirm that he was shielded by qualified immunity on his federal claims.

I

On the afternoon of January 10, 2017, the Montgomery County Police Department received a report that two individuals had been stabbed at the Westfield Mall in Wheaton, Maryland, both of whom died shortly thereafter. Detective Michael Carin, who was designated the lead homicide investigator on the case, was among the officers who received the report. He, together with Detective Randy Kucsan, responded promptly, as did numerous other officers, and Detective Carin took control of the scene. Officers identified and interviewed witnesses, and then Detective Carin and some of the officers watched a surveillance video, which captured much of the crime.

The video footage, which was in color, showed an African American man who was wearing a hoodie walk through a corridor, talking on his phone with his face toward the

3

camera.  After he walked out of view, he appeared again, walking away from the camera until he encountered four men around the corner.  At that point, the man turned towards the camera and walked swiftly past it, again out of sight.  He returned to view seconds later taking a call on his cellphone in one hand and holding a knife in the other.  As the four men approached him, three of them grabbed bamboo sticks from a decorative storefront, and when one struck the man, the man lunged toward the four and appeared to stab one of them before chasing another off the screen with his cellphone and knife still in his hands.

Detective Carin used his cellphone to take a still frame from the video footage of the suspect's face for assistance in his effort to find the suspect if he were still around the mall.  While he later acknowledged that there was "some blurriness to the photo" he took, he nonetheless thought that it was "pretty good."

After taking the still frame photo, Detective Carin and another officer encircled the mall in their police car to see if they could spot the suspect among any of the individuals there.  In the meantime, other officers at the scene, who had also taken still frames from the video footage with their cellphones, promptly texted them to their colleagues to see if other officers recognized the suspect.  The record does not make clear how many different still frames of the video were taken, and it does not include the other officers' texts containing those still frames.  One of those officers, however, Corporal Brendon Johnston, sent out a still frame from the video footage to officers in the Criminal Street Gang Unit, and Detective Juan Lozano, who was in the unit, readily identified the suspect as Angelo Jackson.  After Detective Lozano made that identification, Officer Ed Drew provided the information to Detective Carin while he was still at the mall.

4

When Detective Carin returned to the police station to interview a surviving victim of the crime, he learned that a few months earlier, Angelo Jackson, who was still in school, had been arrested by School Resource Officer George Hyson. Detective Carin texted Officer Hyson and sent him the still frame that he had taken from the surveillance video. Officer Hyson responded, "Looks familiar, not sure at the moment. Face is familiar to me." Detective Carin then asked Officer Hyson if he would check the school yearbooks and get back to him, to which Officer Hyson responded, "Most definitely will do." Thereafter, still during the early evening of January 10, Detective Carin spoke to Officer Hyson by telephone. While Detective Carin later, in his deposition, acknowledged having received Officer Hyson's "looks familiar" text, he testified that during the telephone call, Officer Hyson identified the suspect as Angelo Jackson. Detective Carin recounted the telephone call in further detail, stating that Hyson said that "that was Angelo Jackson," remembering him from an incident that occurred at the high school. After the call, Officer Hyson sent Detective Carin pictures of Jackson's high school ID card, Jackson's mother's driver's license, and a photo of Jackson standing against a wall, taken when Officer Hyson had previously arrested him at school.

In his deposition, Officer Hyson also recalled the telephone call, but he could not recall the substance of what was said except for a few items. He recalled having sent Detective Carin the materials.

Thus, at that point, during the evening of January 10, Detective Carin had information from two independent officers that the suspect in the video footage was Angelo Jackson. With that information, he consulted with his supervisor, Sergeant Dean Cates,

5

and the two of them placed a call to the state prosecutor to determine whether Detective

Carin had enough information to obtain an arrest warrant for Jackson. The prosecutor

counseled that, based on the two independent identifications from surveillance footage,

Detective Carin had enough information to constitute probable cause to seek a warrant for

Jackson's arrest.

Detective Carin then prepared the application, as well as his supporting affidavit, in

which he stated:

> Your affiant is Detective Michael Carin, presently assigned to the Homicide Section of the Montgomery County Department of Police.

> On January 10, 2017 at approximately 1518 hours, officers from the Montgomery County Police were dispatched to Westfield Shopping Center located at 11160 Veirs Mill Road Wheaton, Montgomery County, Maryland, for a report of a subject that was stabbed in the abdomen. Upon arrival, officers discovered two Hispanic male victims suffering from stab wounds. Both subjects were transported to a local hospital and later pronounced deceased.

> As of this writing the victims have not been positively identified. The victims will be referred to as: Victim 1 and Victim 2.

> Investigators interviewed a number of witnesses to the assaults and also learned that the assaults were captured on the mall security video system. The video depicts a black male suspect armed with a knife assaulting both victims.

> The suspect was identified by Montgomery County Police officers who have had prior law enforcement contacts with the suspect. The officers identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained photograph of Angelo Lamont Jackson. That photograph matched the suspect depicted in the video.

> This writer is requesting an arrest warrant be issued for two counts of First Degree Murder (Section 2-201).

6

After Detective Carin "cleared" the application with Sergeant Cates, he submitted it to a commissioner, who issued a warrant for Jackson's arrest early in the morning of January 11, 2017. Jackson was arrested shortly thereafter by other officers and charged with two counts of first-degree murder. The state prosecutor assumed responsibility for the prosecution thereafter, while Detective Carin continued to investigate and, in an ongoing manner, provided the prosecutor with the details being uncovered during his investigation.

Shortly after Jackson's arrest, Detective Carin received additional information from both Detective Lozano and Officer Hyson relating to their identifications. On January 11, Detective Lozano sent Detective Carin, as well as other officers, an email confirming his identification of Jackson:

> On 1/11/2017, there was a double stabbing at Wheaton Plaza Mall. The suspect in the stabbing was recorded on video surveillance. At approximately 1805 hrs, MCPD CSGU Corporal Johnston sent out a still photograph of the suspect. I immediately recognized the suspect as being Angelo Jackson a previously validated gang member of the Hittsquad Gang.

The next day, January 12, Detective Lozano explained further his recognition of Jackson, stating, in relevant part:

> Hittsquad is a gang that we have dealt with on a frequent basis since the time I have been with the Gang Unit. Angelo Jackson is a validated member of the gang and I see his photograph any time that we use the Hittsquad Gang flyer for reference or when we update the flyer. A local rapper, Simba, who is also part of the Hittsquad frequently post[s] rap videos on to Youtube. I view these videos in order to see if I can identify any members of the gang in them. Angelo Jackson is in at least one of these Youtube videos. In August of 2016, during the Montgomery County Agricultural Fair, I observed Angelo Jackson in person walking around the fair. I recognized Angelo Jackson from the pictures we have used of him on the Hittsquad flyer and his involvement in Simba's rap video.

7

Also on January 12, Officer Hyson went to the police station to view the surveillance video and he confirmed his identification of the suspect as Jackson. As Officer Hyson testified, he said to himself after he saw the video, "[O]h, my gosh . . . that's Angelo Jackson, that's him. . . . [I]t just sent chills down my body."

The investigation continued thereafter under Detective Carin's leadership, and officers on the team uncovered evidence that was both inculpating and exculpating of Jackson. On January 13, latent prints on glass at the crime scene excluded Jackson as their source. But a couple of weeks later, on January 26, an eyewitness identified Jackson as the perpetrator from a photo array.

On January 26, 2017, Detective Carin appeared before a grand jury and testified to the identifications made of the suspect by the two officers, as well as the identification made by the eyewitness. The grand jury thereafter indicted Jackson for two counts of first-degree murder.

In the weeks that followed, Detective Carin uncovered additional evidence during his investigation that cast doubt on Jackson's involvement. When shown an enhanced version of the surveillance footage, two officers who had had prior contacts with Jackson said that they thought that the suspect in the footage was not Jackson, but they were not sure either way. Detective Carin also learned that Jackson's cellphone records did not place him at the mall at the time of the crime, which confirmed statements of witnesses who were with Jackson on the afternoon of January 10. Finally, on March 16, 2017, the officers received the results of DNA tests, and the report indicated that Jackson was not a

8

contributor. Immediately following receipt of the DNA-test results, the state prosecutor dropped all charges, and Jackson was released.

As it turned out, another individual, King Conteh, was eventually identified as the suspect, and he was tried and convicted for the murders.

Jackson commenced this action in February 2019 against Detective Carin, alleging in five counts that Carin deliberately or with reckless disregard for the truth misrepresented the nature of the officers' alleged identifications of Jackson in his affidavit supporting the arrest warrant application, as well as in his testimony before the grand jury. Jackson also alleged that the affidavit omitted relevant exculpatory information, particularly the video footage and pictures. Jackson alleged a claim in Count I for violation of his Fourth Amendment rights by detaining him based on the reckless disregard, fabrication or concealment of evidence to obtain a warrant or indictment; in Count II, for violation of the Fourth Amendment based on his unlawful arrest and detention; in Count III, for violation of the Fourth Amendment for malicious prosecution; in Count IV, for violation of Articles 24 and 26 of the Maryland Declaration of Rights on the basis of unlawful detention and malicious prosecution; and in Count V, for gross negligence under Maryland law in providing the information to the commissioner. After the completion of discovery, the parties filed cross-motions for summary judgment.

The district court denied Jackson's motion and granted Detective Carin's. In doing so, it ruled that the undisputed facts demonstrated that Detective Carin had probable cause to seek a warrant for Jackson's arrest, and in any event, that he was shielded by qualified immunity from suit on Jackson's federal claims. For purposes of its probable cause

9

analysis, the court set aside the identification made by Officer Hyson in response to Jackson's claims of disputed facts about that identification, excising reference to his identification from the affidavit. The court thus amended it to read:

> The suspect was identified by **a** Montgomery County Police officer~~s~~ who ~~have~~ **has** had prior law enforcement contact~~s~~ with the suspect. The officer~~s~~ identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained photograph of Angelo Lamont Jackson. That photograph matched the suspect depicted in the video.

*Jackson v. Carin*, 646 F. Supp. 3d 656, 669 (D. Md. 2022). Then, considering the affidavit without Officer Hyson's identification, the court concluded that "the alterations identified [in its modified affidavit] do not negate probable cause." *Id.* Accordingly, it concluded that Detective Carin's alleged misrepresentation of facts concerning Officer Hyson's identification was immaterial.

The district court also concluded that even if Detective Carin were not entitled to summary judgment on the merits, he would still be shielded by qualified immunity from liability on Jackson's federal claims. To the district court, Detective Carin's actions appeared as "those of a reasonable officer working quickly to investigate a double homicide with the evidence available to him at the time," and so the court "struggle[d] to see how Detective Carin's actions show either incompetence or disregard for the law," such that qualified immunity ought not apply. *Jackson*, 646 F. Supp. 3d at 671.

Finally, the district court dismissed Jackson's gross negligence claim, reasoning that "there is no indication in the record that Detective Carin engaged in 'willful and wanton misconduct' or that he 'inflicted injury intentionally or was so utterly indifferent to the rights of others that he acted as if such rights did not exist,' as required to constitute gross

10

negligence." *Jackson*, 646 F. Supp. 3d at 671 (cleaned up) (quoting *Wells v. State*, 642 A.2d 879, 884 (Md. Ct. Spec. App. 1994), and citing *Torbit v. Baltimore City Police Dep't*, 153 A.3d 847, 856 (Md. Ct. Spec. App. 2017)).

From the district court's judgment dated December 19, 2022, Jackson filed this appeal, challenging the district court's rulings (1) finding that probable cause supported Jackson's arrest and detention, (2) finding qualified immunity, and (3) rejecting the Maryland claim of gross negligence.

## II

The claims that Jackson makes throughout his complaint are grounded on his allegation that the affidavit that Detective Carin prepared and filed in support of his application for a warrant to arrest Jackson was false or misleading, creating a false semblance of probable cause. In particular, he relies on three alleged misstatements: (1) that "[t]he suspect was identified by Montgomery County Police officers [in the plural] . . . as Angelo Lamont Jackson"; (2) that the officers "had prior law enforcement contacts with the suspect"; and (3) that "[i]nvestigators obtained [a] photograph of Angelo Lamont Jackson . . . [and it] matched the suspect depicted in the video." He also contends that Detective Carin's failure to include the relevant video footage and pictures of Jackson rendered the affidavit misleading. Had Detective Carin omitted the misinformation and included the video footage and photographs, Jackson argues, the affidavit would have failed to show probable cause, rendering Jackson's arrest, detention, and prosecution unlawful.

11

First, as a general matter, the fact that a neutral magistrate or, in this case, commissioner, issued the arrest warrant is the "clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Similarly, the fact that a grand jury indicted an individual establishes the existence of probable cause. *See Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)). Nonetheless, the person arrested can challenge the probable cause finding by demonstrating that the affidavit filed to obtain the warrant or the testimony given to the grand jury was false or misleading. To mount such a challenge, the arrestee must "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). He must also demonstrate materiality by showing that "with the affidavit's false material set to one side, [its] remaining content [was] insufficient to establish probable cause." *Id*. at 156; *see also Miller v. Prince George's Cnty.*, 475 F.3d 621, 628 (4th Cir. 2007). He can show "reckless disregard" by demonstrating that the affiant "acted with a high degree of awareness of a statement's probable falsity, that is, when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627 (cleaned up). "Reckless disregard" can also be established by evidence that the officer "failed to inform the judicial officer of facts he knew would negate probable cause." *Id*. (cleaned up). But evidence of an affiant's innocent or even negligent mistakes in an

12

affidavit provide no basis for a constitutional violation. *See id*. at 627–28 (quoting *Franks*, 438 U.S. at 171).

In short, to successfully challenge Detective Carin's affidavit in this case, Jackson must show (1) that Carin made false or misleading statements in the affidavit; (2) that the statements were made deliberately or with reckless disregard for the truth; and (3) that the statements were material to a demonstration of probable cause such that, when they are set aside, the remaining content was insufficient to establish probable cause. *See Franks*, 438 U.S. at 155–56; *Miller*, 475 F.3d at 627–31. Thus, "[t]he burden of making the necessary showing is . . . a heavy one to bear." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008).

With these requirements in hand, we turn to the three misstatements alleged by Jackson.

A

As to the first alleged misstatement, Jackson contends that while Detective Carin's affidavit reported that "officers" — in the plural — identified Jackson, apparently referring to the identifications made by Detective Lozano and Officer Hyson, Carin did not have information that Hyson identified the suspect as Jackson. Jackson argues that Officer Hyson reported to Detective Carin only that Jackson looked "familiar" and that to call that an identification was a "gross exaggeration" of the truth.

13

To begin, Jackson does not take issue with the fact that Detective Lozano did indeed identify the suspect in the video as Jackson. Rather, he takes issue with Detective Carin's treatment of Officer Hyson's statements as an identification.

And as to Officer Hyson's identification, the record shows more than Jackson acknowledges. Detective Carin testified that Officer Hyson identified Jackson during their telephone call on January 10 without condition or reservation. In his deposition, Detective Carin explained that when he had earlier received information that Jackson had been "involved with a school resource officer, George Hyson, at a high school where . . . Officer Hyson had arrested Jackson," Detective Carin texted Officer Hyson and provided him with his still frame of the suspect without giving Hyson any explanation or purpose for doing so. Officer Hyson responded by text that the suspect "[l]ook[ed] familiar," and Detective Carin then asked whether Hyson could check school yearbooks for a match. Detective Carin then called Hyson by telephone at about 9:00 p.m. on January 10 and spoke with him. Testifying about the substance of that conversation, Detective Carin acknowledged that he had earlier received Hyson's text, which only expressed *familiarity* with the suspect. But he testified unequivocally that during the telephone conversation, Hyson made a positive identification, telling Carin that "that was Angelo Jackson. [H]e remember[ed] him from the incident that occurred at the high school, and . . . he still had the ID of Mom or somebody because he had the picture — he sent the picture." Thus, from their telephone conversation, Detective Carin understood Hyson to have identified Jackson.

Jackson argues that we cannot consider Detective Carin's deposition testimony regarding his conversation with Officer Hyson, based on the principle that, "[w]hen there

14

is contrary evidence, a 'court may not simply accept what may be a self-serving account by the police officer.'" *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  We conclude from this record, however, that the challenged statement was consistent with the evidence in the record, and it therefore cannot be cast aside.  Moreover, because Detective Carin "believed or appropriately accepted [the information] as true," it could be used in the affidavit. *Franks*, 438 U.S. at 165.

Without acknowledging Detective Carin's testimony, Jackson argues that Officer Hyson's testimony did not support what Carin said because Hyson could only say that Jackson looked "familiar," which did not amount to a positive identification.  While it is true that Officer Hyson sent a text to Detective Carin expressing familiarity with the suspect, as to the following telephone call with Carin, Hyson recalled participating, but he *did not recall* the substance of the exchanges.  Repeatedly, when asked about what he and Detective Carin talked about, he testified that he simply could not recall.  He could, however, recall discussing his former encounter with Jackson.  But in response to the question "What did you talk about on the phone call about the picture?" Officer Hyson could only say, "I don't recall."

A day after Jackson's arrest, however, Officer Hyson viewed the video footage of the suspect and immediately confirmed that the suspect was Jackson.  He reacted with "[O]h, my gosh, I am, like, that's Angelo Jackson, that's him. . . .  [O]h, yes, that's him." In addition, when again looking at photos of Jackson and the surveillance photos during his deposition, Officer Hyson stated that he "still th[ought] that that's the same person . . .

15

I think it is him." While the identifications of Jackson on the day after his arrest and again during his deposition were not information on which Detective Carin relied — by then, he had already obtained the warrant — they do undermine the implication that Hyson *was unable* to identify Jackson in his telephone call with Carin because Hyson's recognition of Jackson was undisputedly confirmed the next day.

The fact that Officer Hyson *could not recall* the substance of his telephone conversation with Detective Carin does not create a dispute as to whether he identified Jackson, as Carin recalled he did. Detective Carin's affidavit is presumed to be valid, and Officer Hyson's "do-not-recall" testimony does not satisfy Jackson's burden to prove otherwise. And any argument that Hyson's "do-not-recall" testimony should be taken as an *inability* to identify because of a lack of knowledge would be belied by Hyson's uncontroverted identification of Jackson the next day.

Thus, Detective Carin relied on information from other officers when preparing the arrest warrant affidavit, and it is well established that he was entitled to do so. We have observed that "statements of other law enforcement officers 'are plainly . . . reliable' even without any special showing." *United States v. Hodge*, 354 F.3d 305, 311 n.1 (4th Cir. 2004) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)); *see also Ventresca,* 380 U.S. at 111 ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number"). Indeed, were we not to recognize the trustworthiness of officers' communications with each other during an investigation, investigations could hardly succeed in solving crimes.

16

In addition, even if Jackson were to persist in his claim that Detective Carin provided false or misleading information in his affidavit about the identification of at least two officers, he still has failed to carry his burden under *Franks* to demonstrate that Carin *deliberately* lied in the affidavit or included false or misleading information *with reckless disregard* for the truth. To show reckless disregard, he must show that Detective Carin acted "with a high degree of awareness of [the statement's] probable falsity." *Miller*, 475 F.3d at 627. In his effort to satisfy this burden, Jackson argues that Detective Carin acted recklessly when he reported that "officers identified the suspect as Angelo Lamont Jackson" because he knew that those identifications were based on still frames of video footage of such poor quality that it could not support an identification. Accordingly, he maintains, Detective Carin was put on notice that the available images could not be a basis for identifying Jackson.

This argument, however, overlooks several facts of record. *First*, it was Corporal Johnston who texted a still frame to Detective Lozano, leading Lozano to identify the suspect as Jackson, and the text that includes Johnston's still frame is not in the record. The still frame on which Jackson relies for his argument was taken by Detective Carin, and Carin never provided it to Detective Lozano or anyone other than Officer Hyson. *Second*, Detective Carin testified that he personally never made a comparison of his still frame with a picture of Jackson. *Third*, while Detective Carin's still frame was sent to Officer Hyson, Hyson did not object to its quality but quickly responded that the person looked familiar. Thus, Jackson's argument that Detective Carin's blurry still frame put him on notice that the statement he made in the affidavit was reckless fails to address the facts that others, not

17

Detective Carin, made the identification, which Carin believed to be truthful. This hardly indicates Detective Carin's reckless disregard for the truth.

Finally, to make a successful *Franks* challenge, Jackson would have to show that with the alleged false information deleted from the affidavit, there would be an insufficient showing of probable cause. The district court took Jackson up on his allegation about Officer Hyson's identification, excluding it and then assessing the affidavit with that information excluded. Even without Officer Hyson's identification, the court concluded that there still was probable cause for the issuance of the warrant. Jackson has not shown otherwise and therefore has also failed to establish materiality.

In short, Jackson has failed to carry his burden under *Franks* as to Detective Carin's statement that "officers identified the suspect as Angelo Lamont Jackson."

B

Jackson's second allegation of a misstatement is that Detective Carin improperly asserted in his affidavit that the officers who identified Jackson "had prior law enforcement contacts with the suspect." Jackson admits that Officer Hyson had prior law enforcement contacts with him by virtue of his prior arrest of Jackson. Rather, Jackson focuses this challenge on Detective Lozano's prior contacts, contending that the statement was misleading because it "implie[d] multiple encounters between Lozano and Jackson on opposing sides of the law," when, in fact, "Lozano testified to a single, passing encounter with Jackson while at a local fair the year before the mall attack." Jackson adds that

18

"[a]side from this fleeting moment, Lozano's only 'contact' with Jackson came in the form of his seeing 'fl[y]ers' and 'see[ing] him on social media a lot.'"

Again, we must consider this challenge in light of the knowledge that Detective Carin had when he executed the affidavit in support of the application.

Detective Carin testified that as he was leaving the scene of the crime on the afternoon of January 10, Detective Ed Drew "approached [his] car and told [him] that the suspect had been identified, and the suspect's name was Angelo Jackson." Detective Carin was also told that "the [C]orporal from the [G]ang [U]nit whose name was Brendon Johnston sent [a still frame of the suspect] out to gang officers, and there was a detective [who] . . . indicated that the suspect was Angelo Jackson," and that detective was Juan Lozano. On the case file note that Detective Carin wrote for that day, he recorded even more — that he had been advised before leaving the scene "by Det. Drew that the [Criminal Street Gang Unit] identified the suspect as a member of the 'Hittsquad' and that suspect's name is: Angelo Jackson." It was well understood that the officers involved with the Criminal Street Gang Unit identified and monitored, on an ongoing basis, members of gangs in Montgomery County, and that, based on this monitoring, they knew gang members by name and appearance. The record thus shows more information than Jackson credits to Detective Carin.

At bottom, Detective Carin's statement that officers had "prior law enforcement contacts" with Jackson was supported by the information he had at the time (1) that Detective Lozano as a member of the Criminal Street Gang Unit knew and encountered

19

Jackson as a member of the Hittsquad and (2) that Officer Hyson had previously arrested Jackson at school.

Thus, in light of the record, Jackson has failed, as necessary for his *Franks* claim, to demonstrate (1) that the statement in Detective Carin's statement was false, (2) that Detective Carin deliberately lied about information or was reckless with respect to its truth, or (3) that any misrepresentation was material.

C

Finally, as to Jackson's third alleged misstatement — that investigators had obtained a photograph of Jackson and it "matched the suspect depicted in the video" — Jackson contends that it was recklessly made because Detective Carin's still frame of the suspect was so poor that he could not assert that it matched a picture of Jackson. And to avoid misleading the commissioner, Jackson maintains, Detective Carin should have provided the commissioner "with the video, pictures, and screen shots necessary to evaluate the reliability of an identification based upon the images." (Footnotes omitted).

Again, to assess this alleged misstatement under the *Franks* standard, we must review what Detective Carin knew at the time he prepared the affidavit late on January 10.

The record shows that Detective Carin relied on identifications of the suspect made by Detective Lozano and Officer Hyson, and not by himself. Detective Carin testified, "My warrant is based on what Hyson said and on what Lozano said. I have no opinion. I did not identify Jackson. The identification was made by Hyson and Lozano." As to how Detective Lozano and Officer Hyson made their identifications, Detective Carin testified

20

that Corporal Johnston had provided the Criminal Street Gang Unit with a still frame of the suspect and that Detective Lozano identified the suspect in that still frame as Jackson. Detective Lozano's identification thus involved matching pictures of Jackson that Lozano had seen on social media and flyers with the still frame. Detective Carin also testified that he had provided Officer Hyson with a still frame of the suspect and that Hyson then compared it with his earlier pictures of Jackson that he had, helping him to identify the suspect as Jackson. Detective Carin's statement in the affidavit, although curt, nonetheless reflected the information that he had received from fellow law enforcement officers. Moreover, the statement was useful in advising the commissioner reviewing the affidavit that the officers' identifications of Jackson were not made in-person, but from photographs.

We conclude that the record does not support Jackson's *Franks* claim that Detective Carin's statement regarding a picture-match was false; that Detective Carin lied about it or was reckless with regard to the truth in making it; and that it was material. As to materiality, the simple fact of identification by two independent officers was enough to support probable cause, and the picture-match statement only provided unnecessary detail about the identification.

D

As to all three challenged statements, we must also recognize the practicalities of the moment. Detective Carin had early information from two different officers identifying the suspect as Jackson, and the investigation was of a serious crime — two murders — in a public mall. Time was of the essence, as was public safety, and Detective Carin prudently

21

moved quickly in the exigent circumstances.  The law recognizes that "affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation,'" *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (quoting *Ventresca*, 380 U.S. at 108), and that therefore "[t]hey must be interpreted in a commonsense manner," *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019).

Not only did Detective Carin base the challenged statements on the information that he had received at the time, but he presented the information to his supervisor, as well as the state prosecutor, for an assessment of whether the information supported probable cause.

In these circumstances, we conclude that Jackson's challenges to the three statements in Detective Carin's affidavit do not satisfy any of the *Franks* requirements. Similarly, they do not, as amplified by other information, support a challenge to the grand jury's indictment.  Accordingly, we affirm the district court's holding that Detective Carin did not violate Jackson's rights under the U.S. Constitution or his congruent rights under the Maryland Declaration of Rights.  *See Waybright v. Frederick Cnty.,* 528 F.3d 199, 203 (4th Cir. 2008); *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 360 (4th Cir. 2010).

III

Even were we not to find that Jackson's claims for unlawful arrest, detention, and prosecution failed on the merits, we would nonetheless conclude that Detective Carin is qualifiedly immune from liability on Jackson's federal claims.

22

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abassi*, 582 U.S. 120, 152 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine protects government officials from liability for "bad guesses in gray areas." *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (cleaned up).

In this case, we agree with the district court that the record establishes that Detective Carin's actions were objectively reasonable, entitling him to qualified immunity on Jackson's federal claims. This was an "all hands on deck" investigation. Detective Carin and his colleagues moved quickly to investigate a double murder that took place at a public shopping center, while the suspect remained at large. When Detective Carin and several other officers arrived at the mall, they spoke to witnesses and watched surveillance footage of the suspect making his attack. They quickly circulated images of the suspect depicted in the video footage to fellow officers. Shortly thereafter, Detective Carin learned that a Criminal Street Gang Unit detective had identified the suspect as Angelo Jackson and that another officer had independently identified the suspect as Jackson, someone whom he had previously arrested. With this information, Detective Carin consulted with his supervisor and a state prosecutor, and both counseled that the information showed probable cause to obtain a warrant for Jackson's arrest. In addition, after Detective Carin completed the preparation of the warrant application, he "cleared" it with his supervisor before submitting it to a commissioner.

This is far from a situation where an officer seeks a warrant based on an affidavit in which he lied or acted with reckless indifference to the truth and then presented it to a

23

judicial officer to rationalize his desire to arrest a person. To the contrary, Detective Carin was clearly acting on and consistent with collected information, and he was attempting to follow the law. We therefore affirm the district court's holding that Detective Carin was entitled to qualified immunity on Jackson's federal claims.

IV

Finally, we address Jackson's argument that the district court improperly granted Detective Carin summary judgment on his claim of gross negligence under Maryland law, a claim to which public official immunity under state law does not apply. *See Cooper v. Rodriguez*, 118 A.3d 829, 833 (Md. 2015). "Gross negligence has been equated with willful and wanton misconduct, a wanton or reckless disregard for human life or for the rights of others." *Wells*, 642 A.2d at 884 (cleaned up). Jackson maintains that Detective Carin acted with gross negligence when he "sought to have Jackson arrested and indicted with reckless disregard for the truth and display[ed] a willingness to mislead the magistrate, state's attorney, and grand jury as to the existence of probable cause."

In this case, however — as we have explained — Detective Carin acted on the information that he had received, and the record does not support that he misrepresented that information in the affidavit submitted to the commissioner. Moreover, we have found no evidence that Detective Carin's actions were willful and wanton misconduct or a wanton or reckless disregard for Jackson's rights. His actions, accordingly, do not constitute gross negligence as would violate Maryland law, and accordingly, we affirm the district court's summary judgment on Count V.

24

V

For Jackson, who, as it was determined, was not the assailant, the 2017 events were a two-month long nightmare.  We understand that with much empathy.  But we also trust that Jackson can understand our ruling.

We are concluding that Detective Carin, based on the information that he received from fellow law enforcement officers, acted consistent with that information and did not violate Jackson's constitutional rights.  To be sure, at times, the process employed during a fast-paced investigation can result in a misidentification.  Fortunately, in the end, many of such failures are rectified, but sometimes not until unfortunate suffering has been sustained.  In this case, Jackson was such a victim.

Our rejection of Jackson's claims against Detective Carin is grounded on our conclusion that the record conclusively establishes that Carin reasonably responded to a serious public risk with the information he had received from fellow officers and that, in doing so, he was fulfilling his duty to efficiently and speedily investigate a very serious crime, although in this case with some unwitting imperfection.  While it was not the legal fault of Detective Carin, the investigation's failure also does not in any way reflect poorly on Jackson.  He still stands vindicated.

The judgment of the district court is

AFFIRMED.

25

DEANDREA GIST BENJAMIN, Circuit Judge, dissenting:

Angelo Lamont Jackson was only 17 years old when he was arrested for a double homicide he did not commit. Jackson languished in jail for 65 days—nearly a full academic quarter of his junior year of high school—as evidence of his innocence piled up. In the warrant for Jackson's arrest, Detective Michael Carin claimed that Jackson had been "identified by Montgomery County Police officers" with whom he'd had "prior law enforcement contacts." This was not true. While acknowledging the affidavit's "unwitting imperfection," the majority holds "that the record conclusively establishes that Carin reasonably responded to a serious public risk with the information he had received from fellow officers." Maj. Op. at 25. But the record here establishes no such thing. Because I would reverse the district court's grant of summary judgment to Carin, I respectfully dissent.

I.

Viewed in the light most favorable to Jackson, the nonmoving party, the record establishes that Carin (1) assumed that Officer George Hyson identified Jackson and (2) fabricated Officer Juan Lozano's "law enforcement contact" with Jackson. *See W. C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019) (citation omitted). The affirmative inclusion of both statements was misleading and demonstrated a reckless disregard for the truth. Those statements, once removed, foreclose the possibility of a finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978);

26

*Miller v. Prince George's Cnty.*, 475 F.3d 621, 627–31 (4th Cir. 2007).  I address the veracity of each statement in turn before addressing recklessness and materiality.

### A.

The timeline of what Hyson and Lozano communicated to Carin and when is spotty. Below is what we know.

### 1.

Sometime during the afternoon of January 10, officers informed Carin that Hyson had arrested Jackson while working as a school resource officer.  That evening, Carin "contacted Officer Hyson and asked him if [he] could send [Hyson] a picture and whether [Hyson] could identify the person depicted in the video."  J.A. 623.  At 9:00 p.m., after Carin sent Hyson a captionless picture of the zoomed-in mall security camera still, Carin and Hyson exchanged the following texts:

HYSON:   Looks familiar, not sure at the moment.  Face is familiar to me
CARIN:   Ok if you can check your yearbooks and get back to me.  Thank you in advance.
HYSON:   Most definitely will do.

Several hours later, Hyson sent Carin pictures of Jackson, his student ID, and his mother's driver's license.  The pictures were not accompanied by any text.  J.A. 243–46, 535.  Hyson testified that when asked about Jackson's picture, he told Carin "[j]ust that it looked familiar."  J.A. 105.  And though "at some point" that night, Hyson "believe[d] it was Angelo Jackson," J.A. 106, he "did not immediately say this is Angelo Jackson."  J.A. 108.  All he recalled was that the suspect was familiar.  J.A. 108 ("It looked familiar.  And yes, this is pretty much it, I think.").

Hyson testified that at some point that evening, he received a call from a detective—presumably Carin.[1]  J.A. 103.  Hyson remembered Carin asking him on the call whether "[he] ever ha[d] any dealings with this person," but it is unclear from the deposition testimony whether "this person" refers to the security camera still Carin sent Hyson or to the images Hyson sent Carin.  J.A. 107.  Hyson did not recall being asked "point blank" if the suspect was Jackson.  J.A. 108.  Hyson alternated between saying that he did not identify Jackson and that he did not *recall* identifying Jackson.[2]  J.A. 109–110.  Minutes later, Hyson testified that he definitively remembered identifying Jackson for the first time on January 12, after Detective Natalie Gwin played him the surveillance video, before

---

[1] Hyson could not consistently recall whether Carin called him before sending the mall security camera still, after Hyson had texted Carin that the suspect's face was "familiar," or after Hyson sent Carin the photos of Jackson, his student ID, and his mother's driver's license.  J.A. 97, 103.  In his interrogatories, Carin claimed to have first "contacted Officer Hyson and asked him if [he] could send [Hyson] a picture and whether he could identify the person depicted in the video" before he "sent Officer Hyson a picture of the suspect from the surveillance video."  J.A. 623.  At that point, "Officer Hyson identified the subject as Angelo Jackson."  J.A. 623.  Carin's notes from the night of January 10 mention Hyson just once, stating that at 9:00 pm, a "photo [was] sent to EFO Hyson."  J.A. 535–36.  Though Carin made note of multiple subsequent phone calls that night, his notes contain no reference to a phone call with Hyson.  J.A. 536–37.  But when he was challenged about Hyson's alleged text identification during his deposition, Carin claimed that Hyson had actually identified him in a subsequent phone call.  J.A. 343–44.  When asked whether his phone records would show their phone call, Carin replied only, "I hope so."  J.A. 344.

[2] Q:  Okay.  So you do remember that you did not definitively say this is Angelo Jackson the night that you were contacted around 9:00 p.m.?

HYSON:  Yes.  I don't recall saying this is definitively him.  I remember -- I don't recall -- I don't recall actually, like you said, that definitive answer, I do not recall.  I did not give a definitive answer.

Q:  So you did not give Detective Carin a definitive answer regarding the identification of this photo that night?

HYSON:  Correct.

Q:  All right.

HYSON:  I don't recall.  I do not recall doing it.

28

walking back his answer to say that he "could not recall" having definitively identified Jackson before that day.  J.A. 113–14.

Carin's deposition testimony timeline about when and how Hyson identified Jackson contradicts his own interrogatories and Hyson's testimony.  First, consistent with his interrogatories, Carin unequivocally testified—twice—that Hyson identified Jackson in their text messages.[3]  J.A. 341.  Then Carin changed his story and testified that Hyson actually identified Jackson during a phone call that evening.[4]  J.A. 344.  Yet Carin could not recall "word for word" what was said, only that Hyson "said that that was Angelo Jackson, he remembers him from the incident that occurred at the high school, and he still had -- I believe he still had the ID of Mom or somebody because he had the picture"—knowledge Carin would have already had through Hyson's position as a school resource officer and the photos Hyson had texted to him.  J.A. 344.

The majority papers over the holes in the officers' testimony in several ways.

First, the majority presents Carin's testimony as if it unequivocally establishes that a positive identification was made during the phone call.  Maj. Op. at 14.  But viewed in the light most favorable to Jackson, as summary judgment requires, *W. C. Eng., Inc.*, 934

---

[3] Q: [Hyson] identified that individual as Angelo Jackson through text message?
CARIN:  Yes. . . .
Q: [Hyson] did identify Mr. Jackson through text message responding to your text message, right?
CARIN:  Right.
[4] Q:  And when he sent those pictures did you take that -- that he was saying that that picture was -- was positively affirmed as Angelo Jackson?
CARIN: Yes.  Because he told us that that was Angelo Jackson.
Q:  All right.  But he did not say that in the text, did he?
CARIN:  I don't think he said in the text, but we spoke on the phone.

F.3d at 402–03, Carin's testimony about the contents of the phone call does no such thing. If Carin perceived Hyson's text acknowledging his familiarity with the suspect and sending pictures of Jackson as an identification, we cannot know that Hyson's alleged oral identification was any more definite. And because mere "familiarity" would not be a confident enough identification to support probable cause, had Hyson made a more definite identification over the phone, Carin, in his preparation for seeking a warrant, should have documented that definite identification. J.A. 192–93 (Captain Jason Cokinos, 30(b)(6) Witness for Montgomery County, agreeing that calling suspect "familiar" is insufficient for probable cause and more definitive identification ought to be demonstrable or documented). It is telling that Carin made no such documentation.

Next, the majority relies on Hyson's January 12 identification to "undermine the implication that Hyson *was unable* to identify Jackson in his telephone call with Carin because Hyson's recognition of Jackson was undisputedly confirmed the next day." Maj. at 16. But Hyson's "undisputed[] confirm[ation]" *after* Carin applied for a warrant cannot turn back time to transform his lukewarm statements about familiarity from the night before into a valid contemporaneous identification.

Furthermore, that Detective Gwin asked Hyson to "come in and sit down and review the video footage to . . . see if [he could] identify the person in the video" suggests the investigative team understood that Hyson had not identified Jackson in his earlier communications. *See* J.A. 111–12. It is similarly interesting that in her notes from that day, Detective Gwin noted she "presented mall video surveillance footage of Incident to Ofc. *familiar* w/Angelo Lamont Jackson"—not an officer who had *identified* Jackson. *See*

30

J.A. 491 (emphasis added).  And it is interesting that the investigative team would continue to seek additional identifications from other officers—several of whom declined to identify Jackson—if they had been confident in the identifications they had obtained at the time Carin applied for a warrant.  *See* J.A. 369–70, 491.

Finally, the science of identifications does not support the majority's contention that Hyson's definite January 12 identification confirms that he had been able to identify Jackson on January 10.  The image Hyson viewed on January 10 was a cell phone picture of a zoomed-in, grainy, dimly-lit still, while on January 12, he identified Jackson after viewing the surveillance video itself.  *See* Kathy Pezdek & Tamar Lerer, *Let's Go to the Tape*, 59 Crim. Law. Bull. 1, 52–54 (Winter 2023) (finding that low resolution, unusually angled, and poorly lit pictures resulted in lower levels of recognition and less accurate identification).  That Hyson identified Jackson after viewing the surveillance tape proves nothing about the likelihood that Hyson identified Jackson when presented with the lower quality still several days before.  *See id.* at 24–25 ("[S]tudies suggest that . . . looking at a still image of faces will result in less accurate recognition than looking at a moving image.").

2.

Carin's statement based on Lozano's identification presents a different problem.  It is undisputed that Lozano identified Jackson.  But Lozano's alleged "law enforcement contacts" with Jackson are more troublesome.

Lozano himself admits that he had only physically "been in the presence" of Jackson once.  J.A. 724–25.  In this single, fleeting encounter, Lozano "casually passed [Jackson]"

31

at a county fair. J.A. 725. Though Lozano was at the fair in his police capacity, he was not looking for or surveilling Jackson, who was there as a patron. J.A. 725. Lozano took no pictures and did nothing to "specifically imprint [Jackson's] face." J.A. 726. In fact, Lozano never even testifies that he confirmed that the individual he saw was Jackson. In sum, Lozano never interacted with Jackson. He was "just basically, like, oh, I think I know that guy and . . . walked on." J.A. 726. Aside from this unconfirmed, contact-less walk-by at the county fair, Lozano's "contacts" with Jackson were limited to seeing Jackson in fliers, social media posts, and the background of "a few rap videos." J.A. 722, 726.

None of Lozano's claimed "contacts" are contacts by any conventional understanding of the term. If an officer casually viewing an individual—or someone they assume to be that individual, unconfirmed—in passing, in public, and while not surveilling them is law enforcement contact, then every person who has ever existed in a public space with an on-duty police officer has had law enforcement contact. If unilaterally viewing—or at least believing you viewed, unconfirmed—someone's image on social media or in a music video is law enforcement contact, then anyone who has ever been viewed or surveilled by a police officer online has had law enforcement contact. This cannot be true. All this to say, Lozano, the only officer to identify Jackson, had *no* prior law enforcement contact with Jackson.

Even if Lozano's limited interactions with Jackson could be considered "law enforcement contacts," there is still no evidence that Carin was aware of Lozano's "contacts" when he authored his affidavit. Carin learned of Lozano's identification of Jackson when Detective Ed Drew "approached [his] car and told [him] that the suspect had

32

been identified [by the Criminal Street Gang Unit (CSGU)], and the suspect's name was Angelo Jackson." Maj. Op. at 19. Another detective then forwarded to Carin Jackson's "target sheet," J.A. 657, which would have only contained information relevant to locating Jackson—not information about prior law enforcement contacts. J.A. 468 (target sheets typically contain "suspect's name, address, phone number, [and]. . . information that [officers] could use to try to locate [suspect]").

Though Corporal Brendon Johnston, the officer who forwarded Jackson's picture to the CSGU, wrote in his January 10 notes that Jackson was "known through numerous law enforcement contacts," J.A. 580, Carin never claims to have seen Johnston's notes. Nothing in the record suggests Johnston communicated with Carin after sending the security still to the CSGU. So, viewed in the light most favorable to Jackson, Carin's only knowledge of Lozano's "contacts" would have come *after* Carin applied for a warrant. *See* J.A. 742 (Lozano's only involvement in investigation was "[sending] the [January 11] e-mail and then [meeting] with Detective Carin a day later"); 480–81 (January 11 application for warrant); 630 (January 11 email); 475 (January 12 statement).

3.

The veracity of Carin's statement that "officers had 'prior law enforcement contacts' with Jackson" requires that the statement "was supported by the information he had at the time: (1) that Detective Lozano as a member of the Criminal Street Gang Unit knew and encountered Jackson as a member of the Hittsquad and (2) that Officer Hyson had previously arrested Jackson at school." Maj. Op. at 19–20. Viewing the record in the light most favorable to Jackson, when Carin drafted the affidavit, he was unaware of any contact

33

between Lozano and Jackson, and Hyson had not yet definitively identified Jackson. Representing that multiple officers had identified Jackson through their law enforcement contacts was therefore false and misleading. *See Franks*, 438 U.S. at 155–56; *Miller*, 475 F.3d at 627–31.

B.

Carin's misleading misrepresentation was also reckless.

Carin could not have reasonably believed Hyson identified Jackson based solely on Hyson's comments about "familiarity." J.A. 191. (Captain Jason Cokinos, 30(b)(6) Witness for Montgomery County, agreeing that saying suspect "looks familiar" is not identification). The "affirmative inclusion" of Hyson's identification and related statements showed a reckless disregard for the truth sufficient to satisfy *Franks*. *See United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) ("[T]he affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory.").

Carin's representation of Jackson's prior law enforcement contact based on Lozano's identification is as infirm. The majority justifies Carin's sloppiness with the excuse that "[t]ime was of the essence." Maj. Op. at 21. But the urgency of an investigation does not justify an experienced officer misleading a magistrate based on his unsupported assumptions. At the time of Jackson's arrest, Carin had worked for the Montgomery County Police Department (MCPD) for fifteen years and for the homicide division for six. J.A. 316–18. As the majority states, "[i]t was well understood that the officers involved with the Criminal Street Gang Unit identified and monitored, on an ongoing basis,

34

members of gangs in Montgomery County, and that, based on this monitoring, they knew gang members by name and appearance." Maj. Op. at 19. As lead investigator and a veteran of the force, Carin would have been aware of the CSGU's practice of surveilling gang members online. Following the logic that Carin knew that CSGU often "identified and monitored" gang members through social media, Carin must have also known that "verified gang member[s]" did not necessarily have prior law enforcement contact. So, crediting Carin for his knowledge and experience with the MCPD as the majority suggests, for Carin to assume and then represent to a magistrate that Jackson had prior "law enforcement contact" based on the CSGU's identification is reckless at best, and a self-serving falsehood at worst.

That "statements of other law enforcement officers" on which Carin based his statement " 'are plainly . . . reliable' even without any special showing" is irrelevant to whether Carin acted with reckless disregard for the truth in authoring his affidavit. *See United States v. Hodge*, 354 F.3d 305, 311 n.1 (4th Cir. 2004) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)). *Ventresca* and *Hodge* are not carte blanche for an officer to draw unsubstantiated inferences from other officers' statements, regardless of the "fast-paced" nature of an investigation. Nor do they permit that officer to affirmatively include their assumptions in an affidavit as if they were the other officers' experiences or observations. Carin's affirmative inclusion of information which he represented as the statements of other officers, but in reality, were his own unsubstantiated assumptions, demonstrates Carin's reckless disregard for the truth. *See Franks*, 438 U.S. at 155–56; *Miller*, 475 F.3d at 627–31.

35

C.

Having determined that Carin acted with reckless disregard for the truth, I turn now to the materiality of those statements.

1.

A statement or omission is material if it is "necessary to the [neutral and disinterested magistrate's] finding of probable cause." *See Miller*, 475 F.3d at 628 (quoting *Franks*, 438 U.S. at 155–56). "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.' " *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)). Probable cause exists where the totality of the facts and circumstances known to the officer would lead a person "of reasonable caution" to believe the suspect had committed an offense. *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

2.

The district court's excised version of the statement, which the majority accepts as proper without analysis, reads:

> The suspect was identified by ~~a~~ **a** Montgomery County Police officer~~s~~ who ~~have~~ **has** had prior law enforcement contact~~s~~ with the suspect. The officer~~s~~ identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained [a] photograph of Angelo Lamont Jackson. That photograph matched the suspect depicted in the video.

Maj. Op. at 10. But that statement does not reflect the issue with Lozano's alleged "law enforcement contacts" or Carin's repeated declarations that he did not determine that the

"photograph matched the suspect depicted in the video." J.A. 348, 356, 367–68.[5] Properly revising the statement to "excise the offending inaccuracies and insert the facts recklessly omitted," *Miller*, 475 F.3d at 628, the statement would read:

> The suspect was identified by **a** Montgomery County Police officer~~s who have had prior law enforcement contacts with the suspect~~. The officer~~s~~ identified the suspect as Angelo Lamont Jackson (B/M; DOB [redacted]). Investigators obtained [a] photograph of Angelo Lamont Jackson. ~~**That photograph matched the suspect depicted in the video.**~~

This bare-bones statement cannot support a finding of probable cause. As the majority notes, "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." Maj. Op. at 16 (quoting *Ventresca*, 380 U.S. at 111). But the inherent reliability of law enforcement officers is not sufficient to automatically establish probable cause. In *United States v. Ventresca*, 380 U.S. 102 (1965), the Supreme Court made plain that "purely conclusory" affidavits, which state "only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based" do not establish probable cause. *Id.* at 108–09 ("Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police."). The majority makes much of a footnote in *United States v. Hodge*, 354 F.3d 305 (4th Cir. 2004), in which the

---

[5] Taking Carin at his word that his affidavit refers only to the determinations of Hyson and Lozano, the final sentence could only be referring to Hyson's identification, as only Hyson "matched" a photograph of Jackson to the security video image. So, because Lozano did not "match" a photo of Jackson to the security video image before Carin swore his affidavit, the removal of any reference to Hyson's identification requires the removal of any reference to "matching" as well.

37

court observed that the "statements of other law enforcement officers 'are plainly . . . reliable' even without any special showing." *Id.* at 311 n.1; Maj. Op. at 16–17. But the recital of circumstances underlying the officers' beliefs is not a "special showing." It is an essential component of the affidavit for civilians and officers alike. *See Ventresca*, 380 U.S. at 108–09.

Unlike the affidavits in *Ventresca* and *Hodge*, Carin's contains no such "recital of circumstances." The affidavits in *Ventresca* and *Hodge* were "detailed and specific." *Ventresca*, 380 U.S. at 109. The *Hodge* affidavit contained "allegations of Hodge's criminal activity as well as the officers' confirmation of the facts that Hodge and [the suspect's alias] were the same person, that Hodge drove a dark green Jeep, and that Hodge had the phone number that the informant had provided." *Hodge*, 354 F.3d at 309–11. The *Ventresca* affidavit contained detailed descriptions of the informant's observation of suspicious activities at the house to be searched on seven separate occasions. *Ventresca*, 380 U.S. at 113–16; *see also id.* at 109 ("The affidavit at issue here . . . is detailed and specific. It sets forth not merely 'some of the underlying circumstances' supporting the officer's belief, but a good many of them."). Carin's excised affidavit fails to set forth any " 'underlying circumstances' supporting the officer's belief" that Jackson was the man pictured in the surveillance footage—it says only that an officer identified Jackson. *See id.* As a result, the amended application for a warrant could not have established probable cause. So, viewing the record in the light most favorable to Jackson, Jackson plausibly stated a claim for malicious prosecution and should have survived summary judgment. *See Miller*, 475 F.3d at 627–31.

38

II.

Finally, Carin's actions are not protected by qualified immunity.

"Qualified immunity shields government officials from liability in a § 1983 suit as long as their conduct has not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *as amended* (Aug. 22, 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We determine whether an officer is shielded by qualified immunity through two questions.

First, we ask if "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Miller*, 475 F.3d at 626–27 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Though "[n]ot every mix-up in issuance of an arrest warrant . . . automatically constitutes a constitutional violation for which a remedy may be sought," "the Supreme Court has made equally clear that police officers cannot intentionally lie in warrant affidavits, or recklessly include or exclude material information known to them." *Id.* at 630 (quoting *Thompson v. Prince William Cnty.*, 753 F.2d 363, 364 (4th Cir. 1985)). Here, as discussed in Part II.B, *supra*, Carin recklessly included false and misleading information in his affidavit for Jackson's warrant. In so doing, he violated Jackson's constitutional rights. *See id.*

Because the answer to the first question is "yes," we advance to " 'the next, sequential step,' which is 'to ask whether the right asserted was clearly established' at the time of the events at issue," meaning that "a reasonable officer would have understood that his conduct violated the asserted right." *Id.* at 627 (quoting *Saucier*, 533 U.S. at 201).

39

"[T]he Fourth Amendment right to be arrested only on probable cause is clearly established." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996).

That Carin claims—without any record or substantiation—to have consulted with his supervisor and the state's attorney before applying for a warrant does not change the analysis. Generally, pursuing the authorization of an attorney points to an officer's reasonableness. *Wadkins v. Arnold*, 214 F.3d 535, 542 (4th Cir. 2000). But this proposition does not apply when the officer "acted in bad faith or . . . provided misleading information to the [state's] [a]ttorney." *Id.* Carin, if he did in fact meet with the state's attorney, told the attorney that two officers had independently identified Jackson. That was not true. Having provided misleading information to the state's attorney, *Wadkins* provides no safe haven. *See id.*

Thus, Carin is not immune from Jackson's § 1983 suit. *See Miller*, 475 F.3d at 626–27 (citing *Saucier*, 533 U.S. at 201).

### III.

While it is important to act swiftly in identifying an assailant, it is more important under our Constitution to identify and arrest the correct person. For, when "the process employed during a fast-paced investigation . . . result[s] in a misidentification," Maj. Op. at 25, focusing time and resources on the incorrect person only increases the risk that evidence unrelated to the arrestee becomes stale and the true perpetrator repeats the crime. *See Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991).

In light of Detective Carin's sloppy police work, it was foreseeable that a misidentification would occur. And as a result of that sloppy police work, Angelo Jackson's

40

junior year of high school was stolen by "a two-month long nightmare" of wrongful arrest and imprisonment. Maj. Op. at 25. In holding that Detective Carin bore no "legal fault" in this tragedy—despite misrepresenting other officers' statements to secure a warrant for Jackson's arrest—this court ensures that Jackson will never be "vindicated" for his suffering in any meaningful way.